**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| CONSERVE SOUTHWEST UTAH,<br>321 N Mall Drive, Suite B202,<br>St. George, UT 84790,<br><br>CONSERVATION LANDS FOUNDATION,<br>825 E 2nd Ave, # 305,<br>Durango, CO 81301,<br><br>CENTER FOR BIOLOGICAL DIVERSITY,<br>1411 K Street NW, Suite 1300,<br>Washington, DC 20005<br><br>SOUTHERN UTAH WILDERNESS<br>ALLIANCE,<br>425 East 100 South,<br>Salt Lake City, UT 84111<br><br>THE WILDERNESS SOCIETY,<br>1801 Pennsylvania Ave NW, Suite 200,<br>Washington, DC 20006<br><br>WILDEARTH GUARDIANS,<br>301 N Guadalupe Street, Suite 201,<br>Santa Fe, NM 87501<br><br>   Plaintiffs,<br><br>   v.<br><br>U.S. DEPARTMENT OF THE INTERIOR,<br>U.S. BUREAU OF LAND MANAGEMENT,<br>U.S. FISH AND WILDLIFE SERVICE,<br>1849 C Street NW,<br>Washington, DC 20240,<br><br>   Defendants. | Case No. 26-CV-317<br><br>**COMPLAINT** |

COMPLAINT — 1

## INTRODUCTION

1.      In the waning days of the first Trump Administration, then-Secretary Bernhardt granted to the Utah Department of Transportation ("UDOT") a right-of-way ("ROW") to punch a four-lane, high-speed highway through the Congressionally-designated Red Cliffs National Conservation Area ("NCA") and designated critical habitat for the threatened Mojave desert tortoise. Because that decision reversed nearly twenty years of scientific and administrative precedent—wherein federal agency scientists repeatedly concluded that a road across the Red Cliffs NCA would harm the conservation values of the Red Cliffs NCA and be "biologically devastating" to the threatened tortoise—and otherwise violated bedrock environmental laws, Plaintiffs sued. *See* Complaint, *Conserve Sw. Utah v. U.S. Dep't of Interior*, Case No 21-CV-15060-ABJ (D.D.C. 2021), ECF No. 1. Defendants and Plaintiffs ultimately settled that case, and Defendants moved to remand the challenged decisions and dismiss the case, which the Court granted. *See id.,* ECF No. 75-2 (2023 Settlement Agreement), ECF No. 81 (Memorandum Decision on Remand) (Nov. 16, 2023), ECF No. 83 (Order of Dismissal) (December 21, 2023).

2.      On remand, Defendants undertook a new environmental review, issued a Final Supplemental Environmental Impact Statement ("SEIS") and Record of Decision, and terminated UDOT's ROW. Defendants took these actions because of the adverse impacts of the Northern Corridor Highway on "Mojave desert tortoise, its designated critical habitat, and historic properties, and the [Bureau of Land Management's ("BLM")] determination that the ROW is inconsistent with the specific legal direction provided in [the Omnibus Public Land Management Act] for management of the NCA."

3.      Over a year later, and with an intervening change in administration, the second Trump Administration reconsidered the decision to terminate UDOT's ROW, and on January 21,

2026, the Defendants again granted UDOT a ROW to construct, operate, and maintain the Northern Corridor Highway.

4.      In this case, the Plaintiff conservation organizations from the prior case challenge the nearly identical decisions by the identical Federal Defendants U.S. Department of the Interior, BLM, and U.S. Fish and Wildlife Service ("FWS") re-approving a ROW for the Northern Corridor Highway through the Red Cliffs NCA and Mojave desert tortoise critical habitat; and again allowing and authorizing the "take" of the threatened Mojave desert tortoise and destruction and adverse modification of its critical habitat. As in the prior case, the Defendants' decisions here again violate numerous bedrock environmental laws, and Defendants have now also run afoul of express commitments made in the 2023 Settlement Agreement and voluntary remand process from the prior related litigation.

5.      As pled below, Plaintiffs seek relief as to: FWS's 2024 Biological Opinion regarding Washington County's 2020 Amended Habitat Conservation Plan ("HCP") ("2024 HCP Biological Opinion"); FWS's 2025 Biological Opinion regarding BLM's re-approval of the Northern Corridor Highway ROW and related actions ("2025 Northern Corridor Biological Opinion"); BLM's 2026 Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI") purporting to satisfy BLM's National Environmental Policy Act ("NEPA") obligations as to its reconsideration of UDOT's ROW ("2026 EA and FONSI"); and BLM's 2026 Decision Record re-approving UDOT's ROW ("2026 Decision Record").

6.      Defendants' approval of these decisions also threatens irreparable environmental and other harms by Defendants' unlawful actions, and Plaintiffs seek such emergency, preliminary, or permanent injunctive relief as necessary to forestall such irreparable harms and protect the public interest pending adjudication of their claims.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question). This Court also can provide relief under 28 U.S.C. § 2201 (declaratory judgment); 28 U.S.C. § 2202 (injunctive relief); and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553, 702, and 706.

8.      The challenged agency actions are final and subject to judicial review pursuant to *Id.* §§ 702, 704, and 706.

9.      Plaintiffs have exhausted all required administrative remedies prior to filing this lawsuit.

10.      Venue in the District of Columbia is appropriate under 28 U.S.C. § 1391(e) because Defendants U.S. Department of Interior, U.S. Bureau of Land Management, and U.S. Fish and Wildlife Service are based in Washington, D.C.; one Plaintiff is headquartered in this District and two other Plaintiffs have offices in this District; and because key decisions giving rise to the claims were made in Washington, D.C. by then Secretary of the Interior David Bernhardt and Director of the Office of Surface Mining, Reclamation, and Enforcement exercising the authority of the Assistant Secretary of Land and Minerals Management, Larry E. Erdos.

## PARTIES

11.      Plaintiff CONSERVE SOUTHWEST UTAH ("CSU") is non-profit organization based in St. George, Utah, working to protect the natural resources and quality of life in Washington County, Utah through direct advocacy of conservation and of Smart Growth policies that enable conservation, for the benefit of present and future generations. CSU promotes a vision of vibrant, compact communities, anchored in high-tech, tourism, and outdoor recreation

industries, which prioritize conservation and stewardship of land, air, and water resources for the long-term sustainability of both these natural resources and communities. CSU has over 5,000 members and supporters, many of whom live near and recreate in Red Cliffs NCA on a regular basis. Since its inception in 2006, CSU has been a leader in engagement on public lands conservation in southwest Utah, especially in the Red Cliffs NCA. In addition to advocacy, CSU staff has spent thousands of hours and organized thousands of volunteer hours to benefit Red Cliffs NCA on the ground, including invasive species removal, litter pick-up, trail maintenance, habitat restoration, and archaeological site stewardship.

12.     Plaintiff CONSERVATION LANDS FOUNDATION, Inc. ("CLF") is a non-profit organization headquartered in Durango, Colorado, with an office and Vice President of Government Affairs staff member based in Washington D.C. CLF's organizational purpose is to promote environmental conservancy through assisting the National Landscape Conservation System (also known as the National Conservation Lands) and preserving open space and wilderness. Upon information and belief, CLF is the only non-profit in the country specifically dedicated to establishing and safeguarding National Conservation Lands under the care of the BLM. To fulfill its purpose, CLF works to protect, restore, and expand the National Conservation Lands— including the Red Cliffs NCA—through education, advocacy, and partnership. CLF maintains regional offices in the District of Columbia and five states.

13.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY (the "Center") is a non-profit corporation headquartered in Tucson, Arizona, with staff and members living and working in Utah. The Center also has an office in Washington, D.C. The Center has over 101,000 members across the United States, including 1,027 members in Utah. The Center's mission is to ensure the preservation, protection, and restoration of biodiversity, native species, ecosystems,

public lands and waters, and public health through science, policy, and environmental law. Based on the understanding that the health and vigor of human societies and the integrity and wildness of the natural environment are closely linked, the Center is working to secure a future for animals and plants hovering on the brink of extinction, for the ecosystems they need to survive, and for a healthy, livable future for us all. The Center has worked to protect the threatened desert tortoise for well over 25 years through constructive comments on project proposals and land use plans, recovery efforts, and when necessary, litigation.

14.    Plaintiff SOUTHERN UTAH WILDERNESS ALLIANCE ("SUWA") is a nonprofit organization based in Salt Lake City, Utah. SUWA also has offices in Washington, D.C.; Moab, Utah; and Chicago, Illinois. It has more than 12,000 members from all 50 states. SUWA's mission is the preservation of the outstanding wilderness and other sensitive public lands at the heart of the Colorado Plateau. SUWA advocates for proper management of these lands, and the associated natural and cultural resources, in their natural state for the benefit of all Americans. SUWA promotes local and national recognition of the region's unique character through research and public education; supports both administrative and legislative initiatives to permanently protect Utah's wild places within the National Park and National Wilderness Preservation Systems or by other protective designations where appropriate; and builds support for such initiatives on both the local and national level.

15.    Plaintiff THE WILDERNESS SOCIETY ("TWS") is a non-profit corporation incorporated and headquartered in the District of Columbia with approximately 402,000 members and supporters nationwide, some 11,000 in Utah, 11,000 in Arizona, and 4,000 in Nevada. TWS' mission is to unite people to protect America's wild places. Its goal is to ensure that future generations will enjoy the clean air and water, wildlife, natural beauty, opportunities

for recreation, and spiritual renewal that pristine forests, rivers, deserts, and mountains provide. For more than three decades, TWS has worked to protect wilderness character lands in Utah. Since 2009, TWS has been actively engaged in the resource management planning process for the Red Cliffs NCA, including meeting with BLM more than 30 times.

16.    Plaintiff WILDEARTH GUARDIANS ("Guardians") is a non-profit organization headquartered in Santa Fe, New Mexico that is dedicated to protecting and restoring the wildlife, wild places, wild rivers, and health of the West. Guardians has 6,364 members. Guardians advocates for public land management that protects wildlife and their habitat, including the Red Cliffs NCA to protect the Mojave desert tortoise.

17.    Plaintiffs each bring this action on their own behalf, and on behalf of their members, staff, and supporters who live near, work in, and recreate in the Red Cliffs NCA. Plaintiffs' members, staff, and supporters enjoy viewing and studying wildlife, and recreating in natural environments that they know are inhabited and sustained by diverse wildlife, including the Mojave desert tortoise. Such members, staff, and supporters derive recreational, scientific, aesthetic, inspirational, educational, and other benefits from such use. These uses include hiking, camping, trail running, mountain biking, appreciation of archaeological resources and natural quiet, journaling, birdwatching, ecosystem research, and photography. They regularly enjoy Red Cliffs NCA for these uses and plan to continue doing so.

18.    These uses are incompatible with construction and use of the Northern Corridor Highway through the heart of Mojave desert tortoise habitat in the Red Cliffs NCA as approved by Defendants. The Northern Corridor Highway harms Plaintiffs and their members, staff, and supporters, because the highway will destroy wildlife habitat and vegetation and diminish their use and enjoyment of the area, and because they are concerned with protecting the wildlife,

plants, scenery, and other natural values of the Red Cliffs NCA, as well as its archeological and cultural resources. Plaintiffs' members, staff, and supporters also enjoy using federal public lands that are wild and not burdened by development such as roads, invasive species, unnatural structures, and other human developments that mar the landscape, create noise and pollution, fragment and degrade wildlife habitat, and generally detract from a quality natural experience.

19.    Plaintiffs and their members, staff, and supporters, as well as their children, grandchildren, and future descendants, will be significantly and irreparably injured by the construction and operation of the Northern Corridor Highway. On behalf of their members, staff, and supporters, Plaintiffs seek to protect the wildlife, scenery, and other natural values of the Red Cliffs NCA from the direct, indirect, and cumulative impacts of the Northern Corridor Highway so that they can continue using and enjoying the area.

20.    Defendants' violations of numerous federal laws in adopting the challenged decisions have injured and will continue to injure Plaintiffs' recreational, aesthetic, scientific, educational, spiritual, conservation, commercial, informational and other interests, and the interests of their staff, members, and supporters. These are actual, concrete injuries caused by Defendants' legal violations, for which judicial review and the relief requested is required to redress. Plaintiffs have no adequate remedy at law.

21.    Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal agency responsible for protecting and managing about 500 million acres of federal public lands across the United States. The Department of the Interior, through its sub-agency BLM, is charged with managing the public lands and resources in Red Cliffs NCA, and decides whether to approve activities necessary for road construction on land it administers, including rights-of-way and amendments to Resource Management Plans ("RMPs") that allow rights-of-way. Secretary

Bernhardt acted on behalf of the Department of Interior in approving the RMP amendments challenged here. Similarly, Office of Surface Mining, Reclamation, and Enforcement Director Lanny E. Erdos, exercising the authority of the Assistant Secretary of Land and Minerals Management, approved the Northern Corridor ROW also challenged here.

22.    Defendant BUREAU OF LAND MANAGEMENT ("BLM") is a federal agency within the Department of the Interior. BLM is responsible for managing the Red Cliffs NCA, conducting NEPA and National Historic Preservation Act ("NHPA") assessments and procedures, and deciding whether to approve the Northern Corridor Highway ROW and related activities such as road construction and RMP amendments that allow rights-of-way. BLM approved the ROW and RMP amendments challenged in this case.

23.    Defendant U.S. FISH AND WILDLIFE SERVICE ("FWS") is a federal agency within the Department of the Interior, and is responsible for administering the provisions of the ESA with regard to threatened and endangered terrestrial and freshwater aquatic species, including the threatened and endangered species found in and around the Red Cliffs NCA and surrounding areas. FWS approved the Biological Opinions, Incidental Take Permit, and Habitat Conservation Plan ("HCP") challenged in this case.

## LEGAL FRAMEWORK

**Omnibus Public Land Management Act of 2009**

24.    In March 2009, Congress passed and President Obama signed the Omnibus Public Land Management Act. Pub. L. No. 111-11, 123 Stat. 991 (2009). Among other provisions, the Omnibus Act created the Red Cliffs NCA. 42 U.S.C. § 460www.

25.    The Red Cliffs NCA includes a total of approximately 44,725 acres of public lands in Washington County, Utah.

26.    Congress designated the Red Cliffs NCA to "conserve, protect, and enhance for the benefit and enjoyment of present and future generations the ecological, scenic, wildlife, recreational, cultural, historical, natural, educational, and scientific resources of the National Conservation Area." *Id.* § 460www(a)(1)(a). Congress also designated the Red Cliffs NCA to protect "each" endangered or threatened wildlife species located within it, including the Mojave desert tortoise. *Id.* § 460www(a)(2).

27.    Congress directed that the Secretary of the Interior "shall" manage the Red Cliffs NCA "in a manner that conserves, protects, and enhances the resources of the National Conservation Area," and Congress directed that the Secretary "shall only allow uses of the National Conservation Area that the Secretary determines would further" the statute's underlying conservation and cultural purposes, described above. *Id.* § 460www(e).

28.    Additionally, Congress provided that "[n]ot later than 3 years after the date of enactment of [the Omnibus Act] . . . the Secretary . . . shall develop a comprehensive travel management plan for the land managed by the [BLM] in [Washington] County." 123 Stat. 1088–89 (2009); Public Law 111-11, Title I, Subtitle O, Section 1977(b)(1). In developing that plan, "the Secretary shall— . . . identify 1 or more alternatives for a northern transportation route in the County." *Id.* Section 1977(b)(2).

**Land and Water Conservation Fund Act of 1964**

29.    The Land and Water Conservation Fund Act became law on January 1, 1965. 54 U.S.C. §§ 200301–10; Pub. L. No. 88-578. The purposes of the act are:

> to assist in preserving, developing, and assuring accessibility to all citizens . . . such quality and quantity of outdoor recreation resources as may be available and are necessary and desirable for individual active participation in such recreation and to strengthen the health and vitality of the citizens of the United States by (1) providing funds for and authorizing Federal assistance to the States in planning, acquisition, and development of needed land and water areas and facilities and (2)

> providing funds for the Federal acquisition and development of certain lands and
> other areas.

Pub. L. No. 88-578. In enacting this statute, Congress sought to facilitate the preservation,

development, and accessibility of outdoor recreation resources by providing funds "for the

acquisition of land, water, or an interest in land or water within inholdings within . . . areas [that]

are primarily of value for outdoor recreation purposes." 54 U.S.C. § 200306(a)(2)(B)(i)(II).

30.     The Land and Water Conservation Fund consists of state-side and federal-side

acquisition programs. The state-side program provides matching grants to the States and local

governments for the acquisition and development of public parks, outdoor recreation areas, and

facilities. *Id*. § 200305. Acquisitions funded through the state-side program must remain in

recreation use in perpetuity, unless the Secretary of the Interior approves the conversion of the

land to another use, and acceptable replacement lands are substituted. *Id.* § 200305(f)(3).

31.     The federal-side acquisition program represents the principal source of funds for

federal acquisition of land. *Id*. § 200306. The statute provides that "unless otherwise allotted in

the appropriation Act making them available," appropriations from the fund for federal purposes

are to be allotted by the President for certain activities. *Id.* § 200306(a)(1). These activities

include land acquisition in recreation areas administered by the Secretary of the Interior for

recreational purposes; land acquisition in national park, national forest, and national wildlife

refuge system units; and land acquisitions that foster access to federal land for recreational

purposes. *See id.* § 200306.

32.     Lands and interests in lands acquired through the federal-side acquisition program

must remain in Federal ownership, and—unlike the state-side program—there is no allowance

for "converting" or using acquired lands for purposes other than those for which they were

acquired. *Compare id*. § 200305(f)(3) (explicitly permitting conversion of state-side

acquisitions), *with id.* § 200306 (federal-side program) (including no reference to permitting

conversion to other uses in the federal-side program). *See also id.* § 200303(c)(3) (requiring that

funds expended "shall be consistent with the requirements for recreational public access for

hunting, fishing, recreational shooting, or other outdoor recreational purposes").

33.     The purposes guiding the acquisition of lands through the federal-side program

"control[] not just the initial acquisition of the lands, but the manner of their development

postacquisition." *Gifford Pinchot Task Force v. Perez*, No. 03:13-CV-00810-HZ, 2014 WL

3019165, at *10 (D. Or. July 3, 2014).

**National Environmental Policy Act**

34.     The National Environmental Policy Act ("NEPA") is our basic national charter for

protection of the environment. The law is intended to help public officials make decisions that

are based on an understanding of environmental consequences, and take actions that protect,

restore, and enhance the environment. *See* 42 U.S.C. § 4331; *Robertson v. Methow Valley*

*Citizens Council*, 490 U.S. 332, 350 (1989).

35.     To accomplish these objectives, NEPA requires federal agencies to evaluate the

reasonably foreseeable environmental effects of their actions. 42 U.S.C. §§ 4332(C)(i)–(ii), 4336.

If the action will have "reasonably foreseeable significant effect on the quality of the human

environment," the agency must prepare an "environmental impact statement" (EIS). *Id.*

§ 4336(b)(1).

36.     An EIS must take a hard look at the environmental impacts of a proposed action

before reaching a decision including by examining the reasonably foreseeable environmental

effects of the action, as well as reasonably foreseeable adverse environmental effects which

cannot be avoided if the action is implemented. *Id.* § 4332(C)(i)–(ii). An EIS must also contain "a reasonable range of alternatives." *Id.* § 4332(C)(iii).

37.     If the reasonably foreseeable effects are not "significant," or if the significance of such effects is unknown, the agency must prepare an "environmental assessment" (EA). *Id.* § 4336(b)(2). The EA process must conclude with a Finding of No Significant Impact ("FONSI") or a determination that an EIS must be prepared. *Id.*

38.     In evaluating an EA and FONSI, courts look at "whether the agency '(1) has accurately identified the relevant environmental concern, (2) has taken a hard look at the problem in preparing its [FONSI or EA], (3) is able to make a convincing case for its [FONSI], and (4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.'" *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011), *as amended* (Jan. 30, 2012) (quoting *TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006)).

39.     In complying with NEPA, the agency must "ensure the professional integrity, including scientific integrity, of the discussion and analysis in an environmental document" and "make use of reliable data and resources." *Id.* §§ 4332(D)–(E).

**Endangered Species Act**

40.     The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–44, seeks to conserve the ecosystems upon which endangered and threatened species depend. 16 U.S.C. § 1531(b).

41.     Section 7 of the ESA requires federal agencies to ensure that actions they authorize, fund, or carry out neither jeopardize the existence of any listed species nor destroy or adversely modify its designated critical habitat. *Id*. § 1536(a)(2). Jeopardy results where an action reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood

of both the survival and recovery of a listed species in the wild by reducing the reproduction,

numbers, or distribution of the species. 50 C.F.R. § 402.02. Destruction or adverse modification

of critical habitat occurs where there is a direct or indirect alteration that appreciably diminishes

the value of critical habitat as a whole for the survival and recovery of a listed species. *Id.* The

ESA also prohibits "take" of a species—take is defined to include harassing, harming, wounding,

killing, trapping, capturing or collecting a listed species, and harm includes significant habitat

modification or degradation that impairs a species' essential behaviors. 16 U.S.C. §§ 1538(a)(1),

1532(19); 50 C.F.R. § 17.3.

42.     To fulfill the substantive mandates of section 7 of the ESA, federal agencies must

consult with an expert agency, FWS or the National Marine Fisheries Service, depending on the

species at issue. 16 U.S.C. § 1536(a)(2). If an activity is likely to adversely affect the species, the

consultation results in the preparation of a biological opinion, which presents FWS's analysis of

the best available scientific data on the status of the species and how it would be affected by the

proposed action. *Id.* § 1536(b)(3)(A). A biological opinion must include a description of the

proposed action, a review of the status of the species and its critical habitat, a discussion of the

environmental baseline, and an analysis of the direct and indirect effects of the proposed action

and the cumulative effects of reasonably certain future state, tribal, local, and private actions.

43.     If FWS finds the action will not jeopardize the species or cause adverse

modification of critical habitat but that it will result in take of a protected species, FWS can

authorize the take through an incidental take statement or permit. *Id.* § 1539(A)(1)(b). To qualify

for the incidental take permit, an applicant must submit to FWS a HCP specifying: (1) the impact

which will likely result from the taking; (2) what steps the applicant will take to minimize and

mitigate such impacts to the extent practicable and the funding that will be available to

implement those steps; (3) what alternatives to the taking the applicant considered and the reasons why the applicant is not employing those alternatives; and (4) other measures that FWS may deem necessary or appropriate for the plan. *Id*. § 1539(a)(2)(A).

44.    After allowing for public review and comment, FWS must determine whether: (1) the taking will be incidental; (2) the applicant will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (3) the applicant will ensure that adequate funding for the plan will be provided; (4) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (5) the measures required by FWS enumerated in the conservation plan will be met. *Id*. § 1539(a)(2)(B). If the applicant satisfies these requirements, FWS shall issue the permit. *Id*.

45.    This Court has interpreted maximum extent practicable to mean "reasonably capable of being accomplished." *Union Neighbors United, Inc. v. Jewell*, 831 F.3d 564, 583 (D.C. Cir. 2016) (quoting *Maximum Extent Practicable*, *Black's Law Dictionary* (10th ed. 2014)). As such, FWS must ensure that the applicant either will take the steps necessary to fully offset the take or that the applicant demonstrated that alternative conservation measures that would fully offset the take are impracticable and that the proposed measures are practicable. *Id*.; *Gerber v. Norton*, 294 F.3d 173, 184–86 (D.C. Cir. 2002).

46.    If FWS determines that the taking of the species will be incidental to the agency action, FWS shall provide the applicant with a written statement: (1) specifying the amount or extent of the incidental taking on the species; (2) identifying reasonable and prudent measures that FWS deems necessary or appropriate to minimize the impact; and (3) adopting terms and conditions that the federal agency or applicant, if any, or both, must comply with to implement the reasonable and prudent measures enumerated by FWS. *Id*. § 1536(b)(4); 50 C.F.R.

§ 402.14(i)(1).

47.    If FWS uses a habitat surrogate to express the amount or extent of anticipated take, it must also describe the causal link between the surrogate and take of the listed species, explain why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and set a clear standard for determining when the level of anticipated take has been exceeded.

48.    Additionally, FWS must include a term and condition to implement each reasonable and prudent measure, as well as certain terms and conditions to allow FWS to gauge compliance with the other terms and conditions. 50 C.F.R. § 17.32(b)(3); *Pac. Shores Subdivision Cal. Water Dist. v. U.S. Army Corps of Eng'rs*, 538 F. Supp. 2d 242, 258–59 (D.D.C. 2008).

49.    FWS must independently determine those necessary or appropriate measures to minimize incidental take, and FWS cannot defer to the applicant's proposed measures without independent analysis and justification. *Gerber*, 294 F.3d at 185; *Public Emps. for Env't Responsibility v. Beaudreau*, 25 F. Supp. 3d 67, 110 (D.D.C. 2014).

50.    Even if after the formal consultation process FWS issues an incidental take permit, the action agency must also independently ensure that its actions do not result in jeopardy or adverse modification of critical habitat. *See Sierra Club v. Marsh*, 816 F.2d 1376, 1385–86 (9th Cir. 1987), *abrogated on other grounds as recognized in Cottonwood Env't Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075 (9th Cir. 2015). Consultation alone does not satisfy an agency's duty under the ESA. *Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir. 1994).

**Administrative Procedure Act**

51.    The APA governs judicial review of agency actions and provides a right to judicial

review for any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." 5 U.S.C. § 702. The APA directs courts to "hold unlawful and set aside agency action . . . found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency actions must also be set aside if made "without observance of procedure required by law." *Id.* § 706(2)(D).

52.    Under the APA, the Court "must assess whether agencies have considered the 'relevant factors' and must 'engage in a 'substantial inquiry' into the facts, one that is 'searching and careful.'" *Level the Playing Field v. Fed. Election Comm'n*, 232 F. Supp. 3d 130, 140 (D.D.C. 2017) (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 34 (D.C. Cir. 1976)). The touchstone of arbitrary-and-capricious review is whether an agency "engage[d] in reasoned decisionmaking." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 16 (2020). "Agency action is arbitrary and capricious 'if the agency has relied on factors which Congress has not intended it to consider'; 'entirely failed to consider an important aspect of the problem'; 'offered an explanation for its decision that runs counter to the evidence before [it]'; or 'is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'" *Am. Clinical Lab'y Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

53.    When an agency changes position or reverses prior decisionmaking, "a reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 516 (2009). "An 'unexplained inconsistency' with an earlier position renders a changed policy arbitrary and capricious." *Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019) (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)).

## FACTUAL BACKGROUND

**Red Cliffs National Conservation Area**

54.    In March 2009, Congress passed and President Obama signed the Omnibus Public Land Management Act. 123 Stat. 991. Among other provisions, the Omnibus Act created the Red Cliffs NCA, which comprises approximately 45,000 acres of BLM-administered surface acres, 2,631 acres of private lands, and 13,735 surface acres owned by the State of Utah in south-central Washington County.

55.    As illustrated on the map below, residential and rural subdivisions, light industrial areas, commercial and retail businesses, and Interstate 15 abut the southern, western, and eastern boundaries of the NCA.



Red Cliffs National Conservation Area (NCA)

56.    Vegetation communities within the Red Cliffs NCA include mostly desert scrub, which ranges from sparse, mostly bare ground to a moderately dense layer of evergreen or

drought-deciduous, broad-leafed shrubs, and/or succulent species adapted to a desert environment. Populations and communities of nonnative, exotic invasive species (including cheatgrass) dominate some areas within Red Cliffs NCA.

57.    Red Cliffs NCA contains nearly 200 miles of non-motorized trails for hiking, mountain biking, and other recreation, and includes two designated Wilderness areas within its boundaries. In fiscal year 2023, the Red Cliffs NCA hosted nearly 610,000 visitors.

58.    The Red Cliffs NCA and public lands in this area also provide important habitat for imperiled native species, like the Mojave desert tortoise, Gila monster, southwestern willow flycatcher, and dozens of bats, songbirds, and other migratory and non-migratory birds. The Red Cliffs NCA contains nearly 50,000 acres of designated critical habitat for the Mojave desert tortoise.

59.    The Red Cliffs NCA is a major component of the 61,000-acre Red Cliffs Desert Reserve ("Desert Reserve"), an area created under Washington County's 1995 Habitat Conservation Plan ("HCP") to protect in perpetuity the area's desert tortoise populations and habitat. *See infra*.

**Mojave Desert Tortoise**

60.    The Mojave desert tortoise is a long-lived, slow-growing tortoise species found across portions of four states to the north and west of the Colorado River, including southwestern Utah, northwestern Arizona, southern Nevada, and southeastern California. Mojave desert tortoises take 13 to 20 years to reach sexual maturity, and their reproduction and growth increases during years with higher precipitation.

61.    Tortoise home range varies depending on sex, location, available resources, and weather patterns; male home ranges can be as large as 220 acres and female home ranges may be

as little as half that size. During droughts, desert tortoises forage over larger areas, and in a lifetime an individual tortoise may use more than 1.5 square miles for habitat, and may occasionally venture more than seven miles outside of its home range on long-distance forays.

62.     Tortoises seek shelter during unfavorable conditions in burrows and caliche caves; and Mojave desert tortoise may remain inactive during periods of drought. The availability of shelter sites is an important aspect of habitat suitability, and tortoises use these burrows—even when active—during the night and the hottest part of the day. An individual Mojave desert tortoise uses an average of 7–12 different burrows within their home range.

63.     Typical tortoise habitat is characterized by scrub brush below 1,677 meters (5,500 feet), where precipitation ranges from 5–20 centimeters, and a relatively high diversity of perennial plants exists. Mojave desert tortoise are selective herbivores. Their diet generally consists of herbaceous perennials and winter annual plants, and they are known to forage on grasses, shrubs and cacti. Mojave desert tortoise prefer native plants over nonnative plants, so a diet composed of mostly nonnative annual grasses—like cheatgrass (*Bromus tectorum*)—does not promote growth of hatchling tortoises.

64.     Current threats to Mojave desert tortoise include loss, disturbance, and fragmentation of habitat from construction projects such as roads, housing and energy developments, conversion of native habitats, and off-road vehicles. Human presence is also a primary factor in tortoise declines. Wildfire increasingly threatens Mojave desert tortoise populations and habitat because it degrades or eliminates habitat. Following wildfire, native plant species are often replaced by invasive, non-native species (including cheatgrass), which results in long-term habitat degradation or loss.

65.     Moreover, roads increase the spread of nonnative plant species, which is known to

reduce desert tortoise forage quality and increase the risk of fire within tortoise habitat. Road vibration, noise, and lights also have potentially significant adverse effects on desert tortoise behavior, communication, and hearing. The placement of roads through tortoise habitat is well understood to harm tortoise by influencing movements and behaviors, fragmenting habitats, and causing direct mortality. The breadth of this impact is a function of the size and frequency of use of the road: the bigger the road and the heavier its traffic use, the greater the direct and indirect impacts of the road on Mojave desert tortoise. A recent scientific study recommends that the density of all roads in areas managed for the conservation of the tortoise be reduced to 0.6 km per $km^2$ or less.

66.     In 1990, FWS designated the Mojave desert tortoise a threatened species under the ESA. 55 Fed. Reg. 12178 (Apr. 2, 1990). The term "threatened species" means "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20).

67.     In 1994, FWS designated critical habitat under the ESA for the Mojave desert tortoise and published a recovery plan dividing the range into six recovery units. The Red Cliffs NCA and surrounding area are included within the Upper Virgin River Recovery Unit ("UVRRU"), which encompasses 54,600 acres of critical habitat, including 46,098 acres within the Red Cliffs NCA. Although the UVRRU is the smallest recovery unit in the Mojave desert tortoise's range, FWS considers this recovery unit of high importance to the range-wide status of the species due to its high population densities of tortoise.

68.     Despite their listing, Mojave desert tortoise populations continue to decline. In 2014, a range-wide Mojave desert tortoise population estimate identified a decline of almost 125,000 adult tortoises over a 10-year period, which represents a nearly 37% overall population

decline. Tortoise populations within the UVRRU experienced a 24.3% decline over this same timeframe. Densities of tortoise in the UVRRU are declining at a rate of 3.2% per year.

69.     The area in and around the Red Cliffs NCA experienced an even more stark population decline of 41% between 1999–2019. And a 2025 study by Utah Division of Wildlife Resources documented an annual mortality rate of 26% within Red Cliffs NCA, Desert Reserve, and Snow Canyon State Park. Within Zone 3—where the Northern Corridor Highway would be located—tortoise densities decreased from 3,409 adults in 2001 to 1,681 adults in 2023. FWS recommends sustaining a population of 2,000 tortoises in Zone 3 to maintain long-term viability.

**Land Acquisitions within the Red Cliffs NCA and Desert Reserve**

70.     For more than 20 years, the Department of Interior has funded the acquisition of land within the Desert Reserve and the Red Cliffs NCA to protect Mojave desert tortoise habitat, recreation, and open space.

71.     Between 1977 and 2020, BLM has spent approximately $21 million using the Land and Water Conservation Fund to acquire 15 parcels, totaling more than 857 acres within the Desert Reserve. An additional three parcels totaling 87.3 acres were purchased since 2020. The stated purpose for each parcel acquisition was to protect desert tortoise habitat and outdoor recreation within the Red Cliffs NCA.

72.     The Northern Corridor is sited directly over at least three of these parcels, encumbering their conservation resources and tortoise habitat. It would indirectly impact at least twelve other parcels.

**Table 1. Relevant Decisions Regarding the Red Cliffs NCA, Washington County Habitat Conservation Plan, and Northern Corridor Highway**

| Decision Short Name | Decision Author | Actions Covered | Status |
|---|---|---|---|
| **1995 Washington County HCP** | Washington County | - For Washington County's ESA compliance<br>- Prerequisite to County's Incidental Take Permit | Superseded by 2020 Amended HCP |
| **1996 Incidental Take Permit** | FWS | - For Washington County's ESA compliance<br>- Authorized Washington County to take listed species | Superseded by 2021 Incidental Take Permit |
| **2016 Red Cliffs NCA RMP** | BLM | - For BLM's management of Red Cliffs NCA and its resources to comply with "conserve, protect, enhance" mandate | Amended by 2021 Record of Decision |
| **Decisions Pertaining to Initial ROW Approval** | | | |
| **2020 FEIS** | BLM and FWS | - NEPA analysis for proposed UDOT's Northern Corridor Highway ROW, RMP amendments, and amended Incidental Take Permit to Washington County | Incorporated by reference in 2026 EA and FONSI |
| **2020 Amended HCP** | Washington County | - For Washington County's ESA compliance<br>- Amended 1995 HCP<br>- Included Northern Corridor Highway as potential development<br>- Prerequisite to new Incidental Take Permit under amended HCP | Remains active |
| **2021 Record of Decision** | BLM and FWS | - Approved Northern Corridor Highway ROW<br>- Approved RMP amendments | Remanded by 2023 court order; ROW decision reversed by 2024 Record of Decision; RMP amendments remain active |
| **2021 HCP Biological Opinion** | FWS | - For FWS's ESA compliance<br>- Analyzed FWS's issuance of Incidental Take Permit based on 2020 Amended HCP, *including* Northern Corridor Highway | Incorporated by reference in 2024 HCP Biological Opinion |

| | | | |
|---|---|---|---|
| **2021 Incidental Take Permit** | FWS | - For Washington County's ESA compliance<br>- Amended 1996 Incidental Take Permit in conjunction with 2020 Amended HCP, *including* Northern Corridor Highway | Superseded by 2024 Incidental Take Permit |
| **2021 Northern Corridor Biological Opinion** | FWS | - For BLM's ESA compliance<br>- Analyzed BLM's issuance of Northern Corridor Highway ROW | Withdrawn, then superseded by 2025 Northern Corridor Biological Opinion |
| **Decisions Pertaining to Court Remand Process and ROW Denial** | | | |
| **2024 SEIS** | BLM & FWS | - NEPA analysis supplementing 2020 FEIS based on new information<br>- Included new alternative to terminate UDOT's Northern Corridor Highway ROW | Incorporated by reference in 2026 EA and FONSI |
| **2024 ROD** | BLM & FWS | - Terminated UDOT's Northern Corridor Highway ROW as contrary to law | Superseded by 2026 Decision Record |
| **2024 HCP Biological Opinion** | FWS | - For FWS's ESA compliance<br>- Analyzed FWS's issuance of amended 2021 Incidental Take Permit in conjunction with 2020 Amended HCP, *excluding* Northern Corridor Highway | Remains active<br><br><span style="color:red">Challenged in this lawsuit</span> |
| **2024 Incidental Take Permit** | FWS | - For Washington County's ESA compliance<br>- Analyzed 2020 Amended HCP, *excluding* Northern Corridor Highway | Remains active |
| **Decisions Pertaining to Re-Approval of ROW** | | | |
| **2025 Northern Corridor Biological Opinion** | FWS | - For BLM's ESA compliance<br>- Re-analyzed BLM's issuance of Northern Corridor Highway ROW and associated actions | Remains active<br><br><span style="color:red">Challenged in this lawsuit</span> |
| **2026 EA and FONSI** | BLM | - NEPA analysis re-considering UDOT's Northern Corridor Highway ROW<br>- Incorporated by reference 2020 FEIS and 2024 SEIS | Remains active<br><br><span style="color:red">Challenged in this lawsuit</span> |
| **2026 Decision Record** | BLM | - Re-approved UDOT's Northern Corridor Highway ROW | Remains active<br><br><span style="color:red">Challenged in this lawsuit</span> |

**1995 Washington County Habitat Conservation Plan and Incidental Take Permit**

73.     In December 1995, Washington County Commissioners first submitted to FWS an HCP for the management of Mojave desert tortoise habitat within Washington County ("1995 HCP"). The conservation measures and strategy in the 1995 HCP were intended to preserve and protect portions of Mojave desert tortoise habitat within Washington County, while at the same time allowing growth and development on other portions of tortoise habitat in the county.

74.     The central element of the 1995 HCP was the creation of the 61,022-acre Red Cliffs Desert Reserve in Washington County. Inside the boundaries of the Desert Reserve, all management actions placed protection of the desert tortoise as the highest priority. Outside the Desert Reserve, development of desert tortoise habitat was allowed in certain areas. FWS considers the Desert Reserve a fragile cornerstone of the UVRRU.

75.     The 1995 HCP created five so-called Management Zones within the Reserve, subject to different rules and regulations concerning habitat protections and other conservation measures. Under this plan, Zone 3—where the Northern Corridor Highway would be located—was to be managed for the conservation and enhancement of the Mojave desert tortoise, with associated restrictions or prohibitions on livestock grazing, camping, mineral withdrawal, and vehicle travel.

76.     In 1996, FWS issued an Incidental Take Permit for the 1995 HCP which allowed development to occur in desert tortoise habitat on non-federal lands in Washington County ("1996 Incidental Take Permit"). The Incidental Take Permit included an expiration date of March 14, 2016.

**2016 Red Cliffs NCA Resource Management Plan**

77.     In December 2016, after a six-year public planning process, BLM approved the Red Cliffs NCA RMP. This plan approved a series of management decisions to conserve, protect, and enhance the resources of the NCA and to protect the federally listed species therein.

78.     The 2016 Red Cliffs NCA RMP adopted a series of avoidance and exclusion areas within the Red Cliffs NCA. An exclusion area is not available as a location for a ROW under any condition. In avoidance areas, BLM must apply heightened protections before locating a ROW. Among other things, BLM must consider options for routing or siting a ROW outside the NCA, ensure consistency of the ROW with the established purpose of the NCA, and authorize new ROWs only when the construction and operation of the ROW would not result in the take of federally listed species.

79.     In the plan, BLM specifically rejected Washington County's proposed alternative designating a new utility and transportation corridor that could accommodate a concept highway. According to BLM, this "northern transportation route" would not satisfy the conservation purposes of the Red Cliffs NCA for many resource values, including threatened and endangered species, cultural resources, scenic qualities, and recreation uses. BLM concluded that this route would create significant adverse impacts on these resources.

80.     FWS agreed with BLM's conclusions and concluded that "the proposed northern transportation route is inconsistent with the [1995 HCP] and NCA because the construction and operation of a multi-lane highway would have significant negative impacts to desert tortoise, their habitat, and the ecological functioning of the Red Cliffs Desert Reserve." According to FWS, the impacts from a northern transportation route would include increased road-kills, habitat fragmentation, invasive species and fire, human access, predation, and increased noise,

which would have "substantial negative impact on the desert tortoise population stability and viability within the Red Cliffs Desert Reserve."

**2018–2021: Initial Decisions Granting UDOT's ROW for the Northern Corridor Highway**

UDOT's 2018 Right-of-Way Application and Associated Draft Environmental Impact Statement

81.     On September 18, 2018, UDOT submitted to BLM an application for a ROW grant for the Northern Corridor Highway to be located in Zone 3 of the Desert Reserve and Red Cliffs NCA.

82.     UDOT's proposed Northern Corridor ROW route is nearly identical to the northern transportation route ROW that BLM rejected in the 2016 Red Cliffs NCA RMP and runs right through the most important high-density cluster of desert tortoises in the entire UVRRU.

83.     In June 2020, BLM and FWS issued a Draft EIS, and sought comment on their proposed alternatives. BLM's proposed action was to issue a 30-year renewable ROW grant to UDOT for the construction, operation, and maintenance of the Northern Corridor Highway across BLM lands. The ROW would be up to 500-feet wide and would accommodate a 4-lane highway with two 12-foot-wide travel lanes in each direction, 8-foot shoulders, and a 20-foot median. In addition, the Northern Corridor Highway would also include a 10–14-foot-wide trail; communications infrastructure; curbs and gutters, drainage swales, and ditches; and would be posted with a 50-mile per hour speed limit. The Northern Corridor Highway would include at least three major interchanges and intersections, and UDOT's alignment would be approximately 4.3 miles long, of which almost 2 miles would cross BLM lands.

84.     The Draft EIS considered five alternatives to the proposed Northern Corridor ROW, and a series of alternatives for the interrelated and interdependent actions amending the

2016 Red Cliffs NCA and St. George Field Office RMPs.

85.    The Draft EIS also included FWS's proposal to issue an incidental take permit to Washington County that would authorize the take of Mojave desert tortoises under the 2020 Amended HCP, discussed *infra.*

2020 Fires in Red Cliffs NCA

86.    In summer 2020, amid the public comment period for the Draft EIS, four human-caused wildfires burned nearly 15,000 acres within the Red Cliffs NCA, including the Turkey Farm Road Fire (11,995 acres), Cottonwood Trail Fire (1,623 acres), Snow Canyon Fire (800 acres), and Lava Ridge Fire (348 acres). These fires consumed almost 9,000 acres of desert tortoise critical habitat, including more than 2,500 previously unburned acres of critical habitat.

87.    On July 21, 2020, Plaintiffs requested BLM and FWS pause the environmental review of the Northern Corridor Highway and associated actions until the agencies fully assessed and examined the ecological impacts of these fires and complete burned area assessments and response plans. On July 27, 2020, the agencies acknowledged this request but did not agree to pause the environmental review.

2020 Final Environmental Impact Statement

88.    On November 12, 2020, BLM and FWS issued a Final EIS ("2020 FEIS") analyzing UDOT's proposed Northern Corridor Highway ROW and associated actions. The 2020 FEIS carried forward the identical alternatives from the Draft EIS and again identified UDOT's Northern Corridor Highway as the proposed action.

89.    The 2020 FEIS disclosed that the Northern Corridor Highway would directly impact native and nonnative vegetation communities, including the complete removal of plants, soil destruction, root compaction, and trampling. It identified probable indirect impacts,

including increased spread of nonnative, exotic species up to one kilometer from the Northern Corridor Highway, further exacerbating the fire cycle within the Red Cliffs NCA and Desert Reserve. In total, the 2020 FEIS determined that issuing the ROW would directly harm 299 acres of vegetation and indirectly harm up to 3,991 acres. Full implementation of all actions (including actions permitted under the 2020 Amended HCP) would impact over 66,000 acres of vegetation.

90.    The 2020 FEIS also concluded that the Northern Corridor Highway would cause the direct loss of 275 acres of tortoise habitat within the ROW and indirectly impact 2,333 acres of habitat, contributing to increasing fragmentation of tortoise habitat within the Red Cliffs NCA. In addition, the 2020 FEIS concluded that the Northern Corridor Highway would permanently eliminate at least 276 acres of desert tortoise critical habitat, fragmenting and degrading at least an additional 2,619 additional acres of critical habitat, and injuring or killing at least 10% of adult desert tortoises and 50% of juveniles and hatchlings.

91.    The 2020 FEIS concluded that construction of the Northern Corridor Highway would directly encroach on three parcels acquired through the Land and Water Conservation Fund. The 2020 FEIS failed to assess the indirect impacts of the Northern Corridor Highway on the other 12 parcels acquired through the Land and Water Conservation Fund.

92.    The 2020 FEIS concluded that the Northern Corridor Highway would "dramatic[ally] change" the recreational experience and resources within the Front Country Recreation Management Zone, finding that the Northern Corridor Highway would cause a "stark or obvious visual change to the natural setting," and "[u]sers would also experience more frequent highway noise," which could "degrad[e] the user experience, especially non-motorized users [who] may expect a more natural desert setting in the Front Country [Recreation Management Zone]."

93.     The 2020 FEIS also determined that granting UDOT's Northern Corridor

Highway ROW would adversely affect historic properties located within the Red Cliffs NCA,

directly impact cultural resources, and cause permanent or long-term effects to archaeological

sites eligible for listing on the National Registry of Historic Preservation.

94.     Additionally, the 2020 FEIS identified a series of other projects in the area that

cumulatively will harm the conservation and cultural resources within the Red Cliffs NCA.

95.     The 2020 FEIS acknowledged that there would likely be a noticeable change in

noise levels in and around UDOT's proposed Northern Corridor Highway because this

alternative will construct a road in a current roadless area but failed to examine the direct and

indirect noise impacts of the highway.

96.     Finally, although UDOT's Northern Corridor Highway route is located

immediately adjacent to private residences in the Green Springs Development, the 2020 FEIS

never examined the impacts of the highway on these homes and residents, including human

health and safety impacts, traffic noise, litter, air and light pollution, quality of sleep, and quality

of life.

<u>2021 Record of Decision</u>

97.     On January 13, 2021, then Secretary of Interior Bernhardt signed a Record of

Decision ("2021 Record of Decision") approving UDOT's ROW for the Northern Corridor

Highway as well as the related amendments to the Red Cliffs and St. George Field Office RMPs.

<u>2020 Amended Habitat Conservation Plan, 2021 Amended Habitat Conservation Plan
Biological Opinion, and 2021 Incidental Take Permit</u>

98.     In October 2020, Washington County adopted and approved the final Washington

County Amended HCP ("2020 Amended HCP"). The 2020 Amended HCP replaced the 1995

HCP and included the Northern Corridor Highway and its associated mitigation measures as a

potential changed development circumstance in the county. Relatedly, Washington County sought to amend its 1996 Incidental Take Permit to authorize take of listed species associated with the 2020 Amended HCP and potential Northern Corridor Highway.

99.     On January 12, 2021, FWS issued a new Biological Opinion and Incidental Take Statement for the Amended Washington County HCP ("2021 HCP Biological Opinion"), which analyzed the effects of the Northern Corridor Highway.

100.    FWS found that the implementation of the 2020 Amended HCP with the construction of the Northern Corridor Highway would take 2,633 tortoises, including 351 adult desert tortoises (or about 8% of the desert tortoises in the UVRRU). Furthermore, FWS concluded the 2020 Amended HCP and the Northern Corridor Highway would result in the permanent loss of 62,960 acres of Mojave desert tortoise habitat, including 633 acres of undeveloped designated critical habitat outside the Desert Reserve and 200 acres of critical habitat within the Desert Reserve. This represents 19% of the estimated desert tortoise habitat in the UVRRU. FWS failed to explain how the loss of 19% of desert tortoise habitat in a unit does not constitute destruction or adverse modification of critical habitat.

101.    To offset the anticipated loss of Mojave desert tortoise habitat by the 2020 Amended HCP and the Northern Corridor Highway, FWS relied in part on the addition of Zone 6 to the Desert Reserve. Zone 6 is non-contiguous with the Red Cliffs NCA and Desert Reserve; it is relatively small (6,813 acres); it does not contain designated critical habitat for the tortoise; and it is unlikely to support an abundance of tortoises on its own, according to BLM. Moreover, Zone 6 is extensively used by motorized and non-motorized recreationists (including for firearms shooting and dispersed long-term camping), and impacts from recreational use include additional trails and roads, degraded soil and vegetation, and increased raven predation.

102.    Despite these findings, FWS concluded that Washington County's commitments to establish, protect, and manage Zone 6 would fully offset the loss of Mojave desert tortoise habitat intactness and connectivity. FWS never explained, discussed, or assessed how the creation of a 6,813-acre Zone 6—which is already degraded—can reasonably be expected to fully and completely offset the adverse impacts flowing from the permanent destruction and modification of fully 62,960 acres of potentially-suitable and occupied tortoise habitat expected to be lost due to the project.

103.    FWS also relied on the installation of passage structures under Cottonwood Springs Road in Zone 3 of the Red Cliffs Desert Reserve to offset the take of Mojave desert tortoises due to habitat fragmentation from the highway, even though the benefit of these structures is unproven and speculative. According to Washington County and FWS, the proposed passage structures are needed to offset the degradation of tortoise habitat and genetic connectivity in the most important high-density tortoise areas in Zone 3 of the Desert Reserve caused by the construction of the Northern Corridor Highway. Washington County intends to provide $150,000 to fund and provide technical assistance for the construction of additional passage structures. In finding that this funding will help offset the take of desert tortoise, FWS claimed that passage structures put in place since the issuance of the 1995 HCP have minimized and mitigated expected habitat fragmentation. Contrary to this claim, though, FWS found that though some use of culverts by tortoise has been documented, it needed more data to evaluate the effectiveness of the existing passage structures.

104.    Despite the uncertainties in the efficacy of Washington County's preferred conservation measures, FWS did not evaluate any alternatives to the proposed mitigation measures that would have provided for a greater offset of the take by the 2020 Amended HCP.

105.     Similarly, even though the 2020 Amended HCP identified eight changed circumstances—"changes in circumstances affecting a species or geographic area covered by [a HCP] that can reasonably be anticipated by [HCP] developers and the [FWS] and that can be planned for"—FWS only analyzed the possible impacts and responses for four changed circumstances.

106.     The 2021 HCP Biological Opinion concluded that implementing the 2020 Amended HCP and approving the Northern Corridor Highway will not jeopardize the continued existence of Mojave desert tortoise or adversely modify tortoise critical habitat. FWS based this conclusion on its finding that Washington County's conservation measures—in particular the protection of Zone 6 and conservation measures such as the tortoise clearance and passage structures discussed above—would completely offset the take of tortoise by the Northern Corridor Highway and the 2020 Amended HCP.

107.     In the Incidental Take Statement, FWS did not adopt a numerical limit on the take of Mojave desert tortoises. FWS failed to adequately explain why it could not identify a numeric value of take, especially when its prior incidental take statement did so and FWS has sufficient population data needed to support a numeric threshold on non-lethal take. Instead, FWS used habitat loss as a surrogate for the take of desert tortoise.

108.     On January 13, 2021, FWS issued and approved a new 25-year Incidental Take Permit to Washington County ("2021 Incidental Take Permit") allowing the incidental take of Mojave desert tortoise in and around the Desert Reserve, including for the Northern Corridor Highway changed circumstance, as proposed under the 2020 Amended HCP.

109.     The 2021 Incidental Take Permit reiterated the findings in the 2021 HCP Biological Opinion, and concluded that: (1) the taking associated with implementation of the

HCP will be incidental; (2) Washington County will, to the maximum extent practicable, minimize and mitigate the impacts of such taking; (3) Washington County will ensure that adequate funding for the 2020 Amended HCP will be provided; (4) the taking will not appreciably reduce the likelihood of the survival and recovery of the species in the wild; and (5) no other measures are necessary or appropriate for the purposes of the HCP.

<u>2021 Northern Corridor Biological Opinion and Incidental Take Statement</u>

110.    Also on January 12, 2021, FWS issued a separate Biological Opinion and Incidental Take Statement covering BLM's approval of the Northern Corridor Highway ROW associated RMP amendments ("2021 Northern Corridor Biological Opinion"), concluding that constructing, operating, and maintaining UDOT's Northern Corridor ROW will not jeopardize the continued existence of Mojave desert tortoise or adversely modify tortoise critical habitat.

111.    The Incidental Take Statement adopted UDOT's four reasonable and prudent measures to minimize the adverse impacts flowing from the Northern Corridor Highway and included only two terms and conditions.

**Initial Lawsuit, Settlement, and Court-Ordered Remand of the 2021 Northern Corridor Decisions**

112.    Plaintiffs filed a lawsuit in D.C. District Court challenging BLM and FWS's 2021 decisions approving the ROW for the Northern Corridor Highway, amending the RMPs for the Red Cliffs NCA and St. George Field Office, issuing the 2021 Northern Corridor Biological Opinion, approving the 2020 Amended HCP and issuing the 2021 HCP Biological Opinion, and issuing the 2021 Incidental Take Permit. The lawsuit alleged that these decisions violated the Omnibus Public Land Management Act, the Land and Water Conservation Fund Act, NEPA, the NHPA, the ESA, and the APA.

113.    After Plaintiffs moved for summary judgment in February 2023, Plaintiffs and

Federal Defendants engaged in productive settlement negotiations. Before further briefing on summary judgment, Defendants moved to voluntarily remand the ROW approval and associated decisions based on some of the legal errors Plaintiffs identified.

114.    Plaintiffs and Defendants also executed a settlement agreement ("2023 Settlement Agreement") whereby—upon the court's granting of Defendants' motion for voluntary remand—Defendants committed to take several actions, including: preparing a supplemental environmental analysis; completing consultation under the NHPA; issuing a new decision on UDOT's ROW application; and updating the 2021 Northern Corridor Biological Opinion and Incidental Take Permit. The 2023 Settlement Agreement also provided "that if the new 2024 decision on the ROW application differs from the 2020 [ROW] decision, [BLM] will amend the RMPs to reflect the 2024 decision. Until that additional planning is complete, BLM will not consider or re-consider a similar ROW application within the NCA." Plaintiffs also "retain[ed] the right to seek relief from judgment or otherwise move to re-open th[e] lawsuit if Federal Defendants do not comply with the terms of the Agreement and any remand order."

115.    Subsequently, in November 2023, the court granted Federal Defendants' motion to voluntary remand, which also triggered the full execution of the terms of the parties' 2023 Settlement Agreement. The court found Federal Defendants' "contention that insufficient attention was given to significant wildfire activity in the Red Cliffs NCA" to be "substantial and legitimate." The court ordered that "[t]he January 13, 2021 grant of ROW issued to Defendant [UDOT], incidental take permit issued to Defendant Washington County, Utah, biological opinions related to the Northern Corridor highway and incidental take permit, amendments to the Red Cliffs NCA and St. George Field Office RMPs, and their associated Records of Decision will be REMANDED to their respective agencies for reconsideration."

116.     Plaintiffs and Defendants accordingly moved to dismiss the case without prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2), which the Court granted on December 21, 2023.

**2024 Remand Decisions and Termination of UDOT's ROW for the Northern Corridor Highway**

117.     In 2024, Federal Defendants issued new decisions pursuant to the Settlement Agreement and the court's remand order.

<u>2024 Supplemental Environmental Impact Statement</u>

118.     In May 2024, BLM and FWS issued a Draft Supplemental Environmental Impact Statement ("SEIS") reconsidering UDOT's ROW application and amended incidental take permit.

119.     The Draft SEIS supplemented the 2020 FEIS with information regarding (1) the trend of increasing frequency and extent of wildfires in the Mojave Desert; (2) the rise of noxious weeds and invasive species in post-burn areas; and (3) the impacts of increased fire and noxious weeds and invasive species on the Mojave desert tortoise. The Draft SEIS included additional information on Mojave desert tortoise, and also addressed the incompatibility of the Northern Corridor Highway with the resources, objects, and values of the Red Cliffs NCA.

120.     Plaintiffs submitted public comments on the Draft SEIS, urging BLM to deny UDOT's ROW application for the Northern Corridor Highway through Red Cliffs NCA.

121.     In November 2024, BLM and FWS issued a Final SEIS reconsidering UDOT's ROW application and Washington County's incidental take permit amendment.

122.     In its analysis of impacts to vegetation and plant communities from the 2020 wildfires, the SEIS concluded that "[t]he further elimination of native shrub species . . . , and reduction of native forb species by the 2020 fires in previously burned and unburned habitats,

represents a decline in Mojave desert tortoise habitat quality that may take decades or centuries

to recover." It noted that a recent assessment determined that "there were significantly fewer

tortoise preferred plant species for both diet and habitat, highlighting the potential risk for long-

term degradation of Mojave desert tortoise habitat post fire."

123.    Further, "with increasing invasive annual grasses and noxious weeds" future fires

"will burn hotter and larger. Areas that burn repeatedly suffer native vegetation loss and see an

increase in invasive annual grasses and noxious weeds, which provide more fuel and are more

flammable than native vegetation, and thus contribute to increased fire frequency."

124.    As to Mojave desert tortoise impacts, the 2020 wildfires "burned a combined

12,437 acres within the Reserve, of which 9,019 acres were designated Mojave desert tortoise

critical habitat," including in "[s]ome of the Reserve's most densely occupied tortoise habitat . . .

adjacent to Cottonwood Springs Road." Wildfires directly impact tortoises via "burning fatalities

or injuries, dehydration, exposure to high temperatures, or smoke inhalation." Indirect impacts

include "loss of plant cover, exposure to predators and extreme heat, reduced food availability,

diversity, quality, change in ecotypes and hydrology, and damage to soil and burrows. High

tortoise mortality and indirect effects of fire can severely affect reproduction, juvenile

recruitment, and the size and survivorship of tortoise populations . . . especially within the

UVRRU, which was identified as the smallest and most at-risk recovery unit within the species

range." A "short fire interval may contribute to extirpation of tortoise populations."

125.    The 2020 Cottonwood Trail fire alone caused mortality of at least 14 tortoises (5

adults and 9 juveniles), accounting for approximately 16.3% of the local adult tortoise

population, though BLM's own experts noted that these numbers underestimate mortality.

126.    According to BLM, UDOT's Northern Corridor ROW alignment would spread

additional noxious and invasive plants as well as have "the potential to further introduce ignition sources during construction and through daily vehicle use. This would increase fire probability and likely increase fire frequency near the highway, which would again lead to an increase in noxious weeds and invasive species." Given current conditions in the Reserve, this would "increase[] the loss of native vegetation and habitat." The increase in fires, "coupled with the loss of native vegetation, would lead to loss of tortoise habitat in Zone 3" in the Reserve.

127.    The Final SEIS also included updated information about the disturbance to Mojave desert tortoise from road construction and development, especially relying on a 2023 study stating that "[a]s road density increases, so does the severity of habitat fragmentation and the probability of detrimental human caused effects in a given area."

128.    The Final SEIS also included recent information regarding Mojave desert tortoise populations in the Reserve and noted that tortoise densities in Zone 3 of the Reserve continue to decline. In its updated analysis, the Final SEIS estimates that the Northern Corridor Highway would indirectly impact a total of 2,333 acres of desert tortoise critical habitat, as well as result in the direct loss of 275 acres of critical habitat. A total of 306 tortoises would be impacted.

129.    Additionally, since the FEIS, three new ESA Section 6 land parcels have been acquired via Section 6 HCP land acquisition grants to UDWR for land within the Reserve. In total, these parcels consist of approximately 120 acres of moderate tortoise density and high tortoise connectivity. Portions of these parcels would be indirectly impacted from UDOT's Northern Corridor ROW alignment. Accordingly, "the conservation value of [these] lands may be degraded so it no longer meets the intended purpose of long-term conservation." In total, 825 acres of Section 6 lands would be directly or indirectly impacted by the Northern Corridor Highway alignment.

130.    Additionally, three new parcels of federal Land and Water Conservation Fund

lands were acquired in the NCA. Two of these are directly adjacent to UDOT's ROW alignment.

<u>2024 Record of Decision Terminating UDOT's Right-of-Way</u>

131.    On December 19, 2024, Acting Deputy Secretary of the Interior Laura Daniel-

Davis signed a new decision terminating UDOT's ROW for the Northern Corridor Highway

("2024 Record of Decision"), due to "the impacts of that [ROW] on Mojave desert tortoise, its

designated critical habitat, and historic properties, and the BLM's determination that the [ROW]

is inconsistent with the specific legal direction provided in [the Omnibus Public Land

Management Act] for management of the NCA." To reach this decision, "BLM applied facts

from the analyses in the FEIS and Final SEIS and other considerations, including input from the

public and various stakeholders, to the governing statutes."

132.    BLM acknowledged that under Section 1977 of the Omnibus Act, it is required to

identify and consider a northern transportation route, but BLM found that "[a]ffirming the

UDOT ROW grant . . . would not comply with OPLMA's mandate that NCA management focus

on the conservation, protection, and enhancement of threatened and endangered species that

occur in the NCA."

133.    Termination of UDOT's ROW would also avoid "adverse effects to as many as

eight historic properties in the NCA" and thus the 2024 Record of Decision "conserves and

protects prehistoric sites that are considered sacred to Tribes that claim cultural affiliation to

Southwestern Utah," thereby making it "compatible with the protection of the cultural and

historic resources of the NCA, as specifically identified in the [Omnibus Act]."

134.    Termination of UDOT's ROW would also "comply with [the Omnibus Act's]

mandate to protect the threatened Mojave desert tortoise and its designated critical habitat in the

NCA, as the Northern Corridor Highway would not be constructed across 1.9 miles of public

land in the NCA." It would avoid tortoise injuries and mortalities during highway construction,

operation, and maintenance as well as avoid translocation and displacement of tortoises.

Termination of the ROW would prevent the loss of 275 acres of tortoise critical habitat and

fragmentation of an additional more than 2,300 acres. Further, it would avoid exacerbating

impacts to the wildfire burn-reburn cycle that could "impede the recovery of this threatened

species in the NCA, Reserve, and UVRRU."

135.    Thus, BLM had authority to terminate the ROW because it was "issued contrary

to the law in effect at that time."

136.    BLM identified the Red Hills Parkway Expressway as the "environmentally

preferable alternative" because it "best meets the BLM's requirement to address all practicable

means to promote the general welfare and avoid or minimize environmental harm and is,

therefore, considered the agency's environmentally preferable alternative." BLM found "this

alternative would have . . . no direct impacts on the threatened Mojave desert tortoise or its

designated critical habitat in the NCA" and would "minimize impacts to the largest contiguous

block of designated critical habitat for the Mojave desert tortoise in the NCA with the highest

tortoise population density in the NCA." Further, BLM determined the Red Hills Parkway

Expressway is compatible with OPLMA's mandate because it would avoid or minimize impacts

to resources the NCA was designated by Congress to conserve, protect, and enhance.

137.    The Record of Decision noted that "[a] letter from UDOT requested a comment

period be offered on the Red Hills Parkway Expressway . . . and *again raised concerns about the*

*technical feasibility of this alternative*." (emphasis added). However, "[p]rior to executing [the]

ROD, the BLM reviewed all of the submissions to determine if they included significant new

information or identified changed circumstances relevant to environmental concerns that bear

upon the proposed action" and "determined that none of the submissions contained significant

new information beyond what was addressed in the Final SEIS, nor did they raise new issues,

based on changed circumstances."

138.    The Record of Decision also stated that "because the 2024 decision on the ROW

application differs from the 2021 ROW decision, the BLM will undertake land use planning

amendments to reflect the 2024 decision. Until that additional planning is complete, BLM will

not consider or reconsider a similar ROW application within the NCA."

<u>2024 Incidental Take Permit and HCP Biological Opinion</u>

139.    On December 10, 2024, FWS signed a new Biological Opinion for the 2020

Amended HCP ("2024 HCP Biological Opinion"). The 2024 HCP Biological Opinion

"supersedes the 2021 [Biological Opinion]" to account for the Northern Corridor Highway

changed circumstance no longer being triggered. It thus updated its analysis to exclude the

Northern Corridor Highway and associated creation of Zone 6. Otherwise, the 2024 HCP

Biological Opinion is nearly identical to the 2021 HCP Biological Opinion and specifically

"incorporated in its entirety" the 2021 HCP Biological Opinion.

140.    The 2024 HCP Biological Opinion covers the entirety of Washington County. The

biological opinion allows incidental take for a variety of human activities causing habitat loss for

a vast area outside the Desert Reserve and up to 200 acres of habitat inside the Reserve. The

Biological Opinion does not identify where this take will occur, and provides no information

regarding location, ownership, number of affected parcels, or other information.

141.    Like the 2021 HCP Biological Opinion, the 2024 HCP Biological Opinion

identified a series of conservation measures to be implemented by Washington County and

various partners to ostensibly benefit desert tortoise, including expanding land acquisitions in and around the Desert Reserve; additional fencing, expanded law enforcement and community education and outreach; development protocols inside and outside the Desert Reserve; recreational management; and pre-construction desert tortoise clearances. Additionally, it identified certain conservation measures that would be implemented only in response to the approval of the Northern Corridor Highway through Zone 3 of the Desert Reserve, including tortoise underpasses along Cottonwood Springs Road; wildfire restoration and other voluntary measures; a new mitigation zone—Zone 6—in the Desert Reserve, as well as fencing installation, recreation reduction, and grazing permit changes in Zone 6.

142.    On information and belief, FWS did not independently examine the efficacy of these conservation measures.

143.    FWS concluded that Washington County's 2020 Amended HCP, excluding development of the Northern Corridor Highway, would not jeopardize the continued existence of desert tortoise or other ESA-listed species in the action area.

144.    FWS concluded that there would be the same effects on desert tortoise critical habitat as analyzed in the 2021 HCP Biological Opinion and would not appreciably diminish the value of the critical habitat for the conservation of the species.

145.    In the Incidental Take Statement, FWS "reviewed and incorporated the County's conservation measures" to address incidental take of desert tortoise.

146.    On December 19, 2024, FWS signed a new incidental take permit to Washington County for its 2020 Amended HCP reflecting BLM's decision to terminate UDOT's ROW for the Northern Corridor Highway ("2024 Incidental Take Permit"). The Incidental Take Permit relies on full and complete compliance with the 2020 Amended HCP.

**2025–2026 Decisions Reapproving UDOT's ROW for the Northern Corridor Highway**

<u>2026 Environmental Assessment</u>

147.    On October 3, 2025, BLM issued a 12-page Draft EA ("2025 Draft EA") re-considering UDOT's ROW for the Northern Corridor Highway based on supposed "new information" provided by UDOT "demonstrat[ing] the technical and economic infeasibility of the Red Hills Parkway Expressway Alternative." The new EA asserted that "[r]eassessment of the original ROW application is warranted to remove the Red Hills Parkway Expressway from consideration, and the EA identified "the UDOT ROW Alignment as the agency's preferred alternative."

148.    On January 21, 2026, BLM issued a 13-page Final EA and FONSI ("2026 Final EA and FONSI") reassessing UDOT's ROW for the Northern Corridor Highway. Like the Draft EA, the Final EA identified UDOT's ROW as BLM's preferred alternative. It determined that "[n]o additional issues or significant information relevant to environmental impacts that would substantially change the analysis in the existing NEPA documents have been identified; therefore . . . no further analysis is provide in the EA beyond what was published in the 2024 Final SEIS . . . and 2020 Final EIS."

<u>2026 Decision Record</u>

149.    Also on January 21, 2026, BLM issued a Decision Record ("2026 Decision Record") re-approving UDOT's ROW for the Northern Corridor Highway. The decision was signed by Director of the Office of Surface Mining, Reclamation, and Enforcement Lanny E. Erdos, exercising the authority of the Assistant Secretary of Lands and Mineral Management and headquartered in D.C.

150.    Despite BLM's 2024 findings reaching the opposite conclusion, BLM determined

that its decision to re-approve UDOT's ROW is compatible with applicable federal laws.

151.    Specifically, BLM found that its decision complies with Section 1974 of the Omnibus Public Land Management Act because it would satisfy a purpose of the Act "by providing a new paved hike and bike path for recreation and scenic views." As to Section 1977 of the Act—which requires only that BLM *identify* a northern transportation route in the County––BLM changed its position from the 2024 Record of Decision and found that the Red Hills Parkway Expressway alternative is not feasible and thus "not a viable alternative for a northern transportation route." BLM stated that it "cannot fulfill Section 1977 by relying on a non-viable alternative route." BLM thus determined that it must issue the Northern Corridor ROW "even if such route may impact some resources of the NCA" because "[t]here is no other viable BLM-managed land that can reasonably support a northern transportation route in the County."

152.    On information and belief, BLM has not developed a travel management plan for Red Cliffs NCA.

153.    It also found the decision complies with the Land and Water Conservation Fund Act. Although the ROW would encumber parcels acquired with the Land and Water Conservation Fund, BLM determined the Northern Corridor "minimizes the encumbrances . . . by avoiding the majority of parcels that were acquired within the Red Cliffs NCA."

154.    BLM did not take any action to amend the RMPs, as required by the 2024 ROD and 2023 Settlement Agreement. Instead, it found that the 2021 RMP amendments "remain in place as approved in 2021."

2025 Northern Corridor Biological Opinion and Incidental Take Statement

155.    On November 25, 2025, prior to the issuance of the 2026 Decision Record and Final EA and FONSI, FWS issued a new biological opinion for BLM's approval of the Northern

Corridor Highway ("2025 Northern Corridor Biological Opinion").

156.    The 2025 Northern Corridor Biological Opinion examined the impacts of BLM's issuance of the Northern Corridor ROW; the management of Zone 6 as mitigation for the Northern Corridor Highway; and mitigation in Zone 3. The analysis is nearly identical to the 2021 Northern Corridor Biological Opinion.

157.    During construction of the highway, any tortoises in the ROW area would be removed and translocated prior to construction; exclusion fencing around the ROW will be used to purportedly minimize effects. FWS acknowledged that translocation and handling of tortoises can cause accidental death or injury, as well as stress to the species. Tortoises will also be vulnerable to effects from the ground-disturbing activities associated with construction and pre-construction, including fatalities and injuries. FWS found that increased noise and vibration from the project "may affect tortoise foraging, breeding, and sheltering behavior, leading to poor health, reduced breeding success, or increased risk of fatality during construction activities."

158.    Once the highway is in operation, death, injury, and adverse impacts to tortoise behavioral patterns may occur from increased human presence, predator subsidies, the introduction and spread of invasive weeds and increased wildfire risk, and altered hydrology. Additionally, the highway will fragment essential tortoise habitat, impacting genetic variation, ability to respond to environmental stochasticity, and other tortoise behaviors. Although UDOT proposes to install bridges and passage structures to reduce these impacts, FWS acknowledged that "[m]ore data is needed to understand if usage is limited by passage design or other ecological, biological, or environmental conditions and how culverts should be spaced to provide adequate connectivity." The long-term effectiveness of these measures "is unknown."

159.    In determining the impacts of construction, maintenance, and operation of the

Northern Corridor Highway, FWS only examined impacts out to 1,667 feet on either side of the highway, instead of a distance supported by best available science; and FWS failed to analyze impacts of traffic volumes and consider the impact of additional roads and/or development enabled by the construction of the highway.

160.    The opinion also acknowledged that there was a "significant increase" of visitors to Red Cliffs NCA between October 1, 2023, and September 30, 2024. Recreation and human presence can result in adverse impacts to desert tortoise habitat and "[h]uman presence is often attributed as a primary factor in desert tortoise declines."

161.    In addition, the 2026 Northern Corridor Biological Opinion examined the impacts of FWS's granting of permission to Utah Department of Wildlife Resources to dispose of ESA Section 6 lands along the NCH ROW in exchange for replacement lands in Zone 6. FWS explained that these lands "will be subject to development and use for the NCH" including direct loss of tortoise habitat, and indirect effects to additional habitat. In exchange, Utah Department of Wildlife Resources would acquire land in Zone 6 and be managed as part of Reserve Zone 6.

162.    FWS concluded that the proposed action would not jeopardize the continued existence of the Mojave desert tortoise or destroy or adversely modify designated critical habitat. FWS estimated that 20% of adult tortoises within the ROW area would be injured or killed during highway construction activities and 50% of juveniles and hatchlings. Additionally, 210 tortoises of all life stages could be injured or killed during the 30-year initial term of the project. FWS concluded that this lethality would not "appreciably affect both the survival and recovery of desert tortoises in the wild."

163.    FWS further estimated that the Northern Corridor Highway will directly and permanently destroy 275 acres of tortoise critical habitat, and further fragment and degrade an

additional 2,333 acres of critical habitat. The total lost or degraded critical habitat is 2,608 acres, which is approximately 6.1% of all tortoise critical habitat in the Red Cliffs NCA. FWS concluded that the directly destroyed critical habitat would not diminish the value of critical habitat "as a whole" but relied entirely on the 25-year restoration efforts to offset the impacts to fragmented and degraded habitat. FWS also relied on the creation of Zone 6 to offset impacts to the tortoise's loss of habitat.

164.    FWS did not explain roughly at what point survival and recovery of Mojave desert tortoise will be placed at risk from the highway, despite its substantial effects to tortoise population numbers and critical habitat.

165.    FWS also did not explain, discuss, or assess how the creation of Zone 6—which is non-contiguous with the Red Cliffs NCA, already degraded, and does not contain critical habitat—can reasonably be expected to fully and completely offset the adverse impacts flowing from the permanent destruction and modification of *critical* tortoise habitat in Zone 3 expected to be lost due to the project.

166.    Additionally, FWS did not explain its finding that there was no potential for future road development within the Reserve and that the Northern Corridor Highway was "the only substantial development project affecting the Reserve in the future."

167.    FWS also did not explain how the installation of passage structures will effectively offset the harm to Mojave desert tortoises due to habitat fragmentation, even though the benefit of these structures is unproven and speculative.

168.    FWS also did not evaluate any alternatives to the mitigation measures proposed by Washington County in the 2020 Amended HCP that would have provided for a greater offset of the impacts and take to tortoises.

169.    The Incidental Take Statement adopted the same four reasonable and prudent measures to minimize take as the prior 2021 Biological Opinion: (a) requiring updated tortoise handling and translocation protocols; (b) designing the highway to minimize desert tortoise fragmentation and facilitate tortoise dispersal by constructing passage structures; (c) dedicating funding and staff toward targeting successful habitat restoration annually in the Red Cliffs NCA; and (d) ensuring biological monitoring expertise on the site throughout project construction and development.

170.    FWS's Incidental Take Statement failed to include any terms and conditions governing implementation of these four measures. Instead, FWS included only two terms and conditions: (a) requiring BLM submit to FWS a handling and translocation report; and (b) requiring BLM to report to FWS any post-construction desert tortoise fatalities on the Northern Corridor Highway within 72 hours of discovery of the fatalities. The Incidental Take Statement contained no term and condition regarding implementation of the design, funding, and staffing measures described above.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of the Omnibus Public Land Management Act and APA
### (2026 Decision Record)

171.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

172.    This First Claim for Relief challenges Defendants' violation of the Omnibus Public Land Management Act, which requires the Secretary to manage the Red Cliffs NCA "in a manner that conserves, protects, and enhances the resources of the National Conservation Area." 42 U.S.C. § 460www(e)(1)(A). This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

173.    Defendants' approval of the 2026 Decision Record and re-issuance of a ROW grant to UDOT on BLM-administered lands within the Red Cliffs NCA fails to conserve, protect, and enhance the ecological, scenic, wildlife, recreational, cultural, historic, and natural resources within the Red Cliffs NCA and fails to protect "each" endangered or threatened wildlife species located within it, including the Mojave desert tortoise, in violation of Section 1974 of the Omnibus Act, including by, *inter alia*:

   a.   permanently eliminating at least 275 acres of desert tortoise critical habitat, fragmenting and degrading at least 2,333 additional acres of critical habitat, and injuring or killing approximately 20% of adult desert tortoises and 50% of juveniles and hatchlings within the Northern Corridor ROW;

   b.   causing direct and indirect harm to general wildlife species within the Red Cliffs NCA, including both direct habitat loss and on-going habitat degradation and fragmentation;

   c.   directly and permanently harming the native vegetation communities within the Red Cliffs NCA, and promoting the spread of exotic invasive species—and, thus, exacerbating the potential for future wildfires—across the Red Cliffs NCA;

   d.   causing adverse effects to historic properties, causing permanent or long-term adverse effects to archaeological sites, and directly adversely impacting a prehistoric petroglyph panel within the area of UDOT's Northern Corridor ROW;

   e.   causing long-term, adverse visual impacts to areas within the Red Cliffs NCA of high scenic quality and high visual sensitivity;

   f.   degrading the recreational and user experience across the Front Country Recreation Management Zone by creating a dramatic and stark change to the existing

recreational experience, and negatively impacting access and use of existing and

proposed non-motorized trails; and

g.  increasing noise levels by constructing, operating, and maintaining a four-lane

highway, including in an area where no roadway currently exists.

174.    Defendants' approval of the Northern Corridor Highway ROW prior to the development

of a comprehensive travel management plan for Washington County is also contrary to the

Omnibus Public Land Management Act, Section 1977. 123 Stat. 1088–89 (2009); Public Law

111-11, Title I, Subtitle O, Section 1977.

175.    For the foregoing reasons, the Court should hold that Defendants' re-approval and grant

of a ROW authorization to UDOT in the 2026 Decision Record is arbitrary, capricious, an

abuse of discretion, and not in accordance with law under the Omnibus Public Land

Management Act and the APA, and therefore must be reversed, set aside, and vacated under

the APA, 5 U.S.C. § 706(2)(A), (D).

**SECOND CLAIM FOR RELIEF**
**Violation of the Land and Water Conservation Fund Act and APA**
**(2026 Decision Record)**

176.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

177.    This Second Claim for Relief challenges Defendants' violations of the Land and

Water Conservation Fund Act, which requires Defendants to manage lands acquired through the

Land and Water Conservation Fund in a manner consistent with the purposes informing the

acquisition. 54 U.S.C. §§ 200301–310; Pub. L. No. 88-578; *see also Perez*, 2014 WL 3019165 at

*10. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

178.    As noted above, BLM acquired approximately 18 parcels within the Red Cliffs

NCA using the Land and Water Conservation Fund, for the purposes of protecting and preserving

habitat for the Mojave desert tortoise and recreational opportunities. In approving the construction, operation, and maintenance of the Northern Corridor Highway on and near lands acquired through the Land and Water Conservation Fund for wildlife habitat purposes, Defendants have failed to adhere to the purposes guiding these acquisitions, including by, *inter alia*:

    a.  promoting the spread and expansion of nonnative plant species outside the immediate ROW, which is known to reduce desert tortoise forage quality and increases the risk of fire within tortoise habitat;

    b.  promoting habitat fragmentation and physical barriers to movement which will reduce habitat connectivity, significantly decreasing gene flow among tortoise populations and potentially increasing genetic isolation;

    c.  increasing vibration, noise, and lights, which are known to have potentially significant detrimental effects on desert tortoise behavior, communication and hearing, and may affect tortoise foraging, breeding and sheltering behavior, leading to poor health, reduced breeding success, or increased risk of mortality;

    d.  increasing vulnerabilities of desert tortoises to effects of ground-disturbing activities, including crushing, entombing in burrows and dens, increased vandalism and collection, fragmenting habitats, and causing direct mortality; and

    e.  increasing human activity in and around tortoise habitat, which may facilitate expansion of raven and coyote populations into areas impacted by the Northern Corridor Highway, causing increased predation on tortoise.

179.    For the foregoing reasons, the Court should hold that Defendants' re-approval and grant of a ROW authorization to UDOT in the 2026 Decision Record is arbitrary, capricious, an

abuse of discretion, and not in accordance with law under the Land and Water Conservation

Fund Act and the APA, and therefore must be reversed, set aside, and vacated under the APA,

5 U.S.C. § 706(2)(A), (D).

## THIRD CLAIM FOR RELIEF
### Violations of NEPA, the Omnibus Public Land Management Act, and APA
### (2026 Decision Record)

180.    Plaintiffs reallege and incorporate by reference all preceding paragraphs.

181.    This Third Claim for Relief challenges Defendants' violations of the APA in

approving the 2026 Decision Record granting UDOT's ROW for the Northern Corridor

Highway. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C.

§ 706.

182.    BLM's re-approval of UDOT's ROW for the Northern Corridor Highway in the

2026 Decision Record constitutes an unreasonable, unexplained, and arbitrary reversal of an

agency decision, in violation of the APA, 5 U.S.C. § 706(2), including for the following reasons.

   a.  In the 2024 Record of Decision, BLM terminated UDOT's ROW after conducting

       supplemental environmental analysis and determining that "[a]ffirming the UDOT

       ROW grant . . . would not comply with [the Omnibus Public Lands Management

       Act's] mandate that NCA management focus on the conservation, protection, and

       enhancement of threatened and endangered species that occur in the NCA."

   b.  In the 2023 Settlement Agreement with Plaintiffs, as well as in the 2024 Record of

       Decision, BLM "agree[d] that if the new 2024 decision on the ROW application

       differs from the 2020 ROW decision, [BLM] will amend the RMPs to reflect the 2024

       decision. Until that additional planning is complete, BLM will not consider or re-

       consider a similar ROW application within the NCA." BLM did not amend the RMPs

to reflect the 2024 decision before re-considering UDOT's ROW application.

c. BLM's 2026 Decision Record was not based on "new information" warranting reconsideration of UDOT's ROW. For instance, in the 2024 Record of Decision terminating UDOT's ROW, BLM responded to similar assertions from UDOT regarding the infeasibility of the Red Hills Parkway Expressway and determined that they did not constitute "significant new information beyond what was addressed in the Final SEIS."

d. BLM's 2026 Decision Record reached the opposite conclusion from the 2016 Red Cliffs NCA RMP. For instance, in the 2016 RMP process BLM determined that designation of the proposed Northern Corridor Highway "would not satisfy the conservation purposes of the NCA for many resource values, including threatened, and endangered species, cultural resources, scenic qualities, and recreation uses, as developments within the corridor would create significant impacts on these resources."

183.   Accordingly, Defendants' 2026 Decision Record re-approving the Northern Corridor Highway ROW was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D).

### FOURTH CLAIM FOR RELIEF
### Violations of NEPA and APA
### (2026 EA, FONSI, and Decision Record)

184.   Plaintiffs reallege and incorporate by reference all preceding paragraphs.

185.   This Fourth Claim for Relief challenges Defendants' violations of NEPA, 43 U.S.C. §§ 4321 *et seq.*, in approving the 2026 EA, FONSI, and Decision Record for the Northern

Corridor Highway ROW. This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

186.    NEPA requires federal agencies take a "hard look" at the impacts of their proposed actions, including using high-quality information, accurate scientific analyses, and scientific integrity. Defendants violated these requirements by approving the 2026 EA and FONSI that relied on the 2020 FEIS, which failed to take a "hard look" at the impacts of the Northern Corridor Highway, including by, *inter alia*:

a.    failing to fully examine and disclose the direct impacts of the Northern Corridor Highway, including the impacts of increased noise on the Mojave desert tortoise and other wildlife, as well as the scenic and recreational resources within the Red Cliffs NCA and the adjacent community of Green Springs;

b.    failing to fully examine and disclose the indirect impacts of the Northern Corridor Highway on the Mojave desert tortoise and other wildlife, as well as the ecological, scenic, recreational, cultural, historic, and natural resources within the Red Cliffs NCA; and instead relying on cramped indirect analysis areas that ignored the full scope of the impacts of the Northern Corridor Highway and associated actions; and

c.    failing to fully examine and disclose the cumulative impacts of constructing, operating and maintaining the Northern Corridor Highway.

187.    Additionally, NEPA requires an agency to prepare an EIS for any agency action with a reasonably foreseeable significant effect on the environment, 42 U.S.C. § 4336(b). Between the time of Defendants' 2024 Final SEIS terminating the Northern Corridor ROW and 2025 EA reconsidering the Northern Corridor ROW, significant new information and events have arisen that warranted the preparation of a supplemental EIS. This includes, *inter alia*, significant

information regarding the continued decline and imperiled status of the Mojave desert tortoise population within Red Cliffs NCA.

188.    Yet, Defendants refused to prepare a supplemental EIS to consider this information. Indeed, the 2025 EA fails to consider, cite, or examine this new information and how it might inform the highway's impact on threatened Mojave desert tortoise.

189.    Accordingly, Defendants' 2026 EA, FONSI, and Decision Record for the Northern Corridor Highway ROW was arbitrary, capricious, an abuse of discretion, and not in accordance with NEPA and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D).

**FIFTH CLAIM FOR RELIEF**
**Violation of ESA § 7 and APA**
**(2024 HCP Biological Opinion and Incidental Take Statement)**

190.    Plaintiffs incorporate by reference all preceding paragraphs.

191.    This Fifth Claim for Relief challenges FWS's approval and issuance of the 2024 HCP Biological Opinion and Incidental Take Statement, which incorporate the 2021 HCP Biological Opinion and Incidental Take Statement, for violating Section 7 of the ESA and its implementing regulations, which require FWS to ensure that major federal actions do not jeopardize the survival of a protected species or destroy or adversely modify its critical habitat. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1). This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

192.    FWS's 2024 HCP Biological Opinion and Incidental Take Statement violate Section 7 of the ESA and APA in the following ways, each of which is a distinct and separate violation of law:

a.  FWS failed to adequately examine the direct, indirect, and cumulative impacts of the 2020 Amended HCP;

b.   FWS failed to examine the growth-inducing impacts of the Northern Corridor Highway together with the actions and authorizations permitted under the 2020 Amended HCP within and outside the Red Cliffs NCA;

c.  FWS failed to assess and analyze the impacts of four of the eight changed circumstances;

d.  FWS's no jeopardy conclusion is arbitrary and capricious because FWS failed to examine and explain at what point survival and recovery of the Mojave desert tortoise will be placed at risk, and FWS cannot reasonably determine that implementation of the 2020 Amended HCP will avoid jeopardy absent this assessment;

e.  FWS's determination that implementing the 2020 Amended HCP, together with the construction, operation, and maintenance of the Northern Corridor Highway, will not adversely modify or destroy tortoise critical habitat is arbitrary and capricious;

f.  FWS failed to independently examine and review the adequacy and efficacy of the Washington County's proposed reasonable and prudent measures and terms and conditions; and

g.  FWS improperly used habitat surrogate instead of number of individuals to estimate take and set trigger for reinitiation and failed to explain why it could not use a numeric take value.

193.    Each of these failures is arbitrary, capricious, an abuse of discretion, and a violation of law, and these failures, in turn, prevented FWS from taking further steps required under the ESA to ensure the 2020 Amended HCP, Northern Corridor Highway, and associated

actions neither jeopardizes the survival or recovery of the Mojave desert tortoise, nor destroy or adversely modify its critical habitat.

194.    Accordingly, the Court should hold FWS's 2024 HCP Biological Opinion and Incidental Take Statement arbitrary, capricious, an abuse of discretion, not in accordance with ESA and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D).

**SIXTH CLAIM FOR RELIEF**
**Violation of ESA § 7 and APA**
**(2025 Northern Corridor Biological Opinion and Incidental Take Statement)**

195.    Plaintiffs incorporate by reference all preceding paragraphs.

196.    This Sixth Claim for Relief challenges FWS's approval and issuance of the 2025 Northern Corridor Biological Opinion and Incidental Take Statement for violating Section 7 of the ESA and its implementing regulations, which require FWS to ensure that major federal actions do not jeopardize the survival of a protected species or destroy or adversely modify its critical habitat.  16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1). This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

197.    FWS's 2025 Northern Corridor Biological Opinion and Incidental Take Statement violate Section 7 of the ESA and APA in the following ways, each of which is a distinct and separate violation of law:

  a.  FWS failed to adequately examine the direct, indirect, and cumulative impacts of the Northern Corridor Highway;

  b.  FWS failed to examine the growth-inducing impacts of the Northern Corridor Highway within and outside the Red Cliffs NCA;

c.  FWS no jeopardy conclusion and adverse modification of critical habitat analysis were based on unproven, ineffective, and unreasonable mitigation measures;

d.  FWS's no jeopardy conclusion is arbitrary and capricious because, *inter alia*, FWS failed to examine and explain at what point survival and recovery of the Mojave desert tortoise will be placed at risk, and FWS cannot reasonably determine that construction, operation and maintenance of the Northern Corridor Highway will avoid jeopardy absent this assessment;

e.  FWS's determination that the construction, operation, and maintenance of the Northern Corridor Highway, together with implementing the 2020 Habitat Conservation Plan, will avoid adverse modification and destruction of tortoise critical habitat is arbitrary and capricious;

f.  FWS failed to conduct a legally sufficient adverse modification analysis, and arbitrarily concluded that the Northern Corridor Highway would not diminish the value of desert tortoise critical habitat "as a whole," instead of determining whether the project would destroy or adversely modify the species' critical habitat; and

g.  FWS failed to independently examine the adequacy of UDOT's preferred reasonable and prudent measures, and further failed to identify and adopt terms and conditions governing implementation of two of these measures.

198.    Each of these failures was arbitrary, capricious, an abuse of discretion, and a violation of law, and these failures, in turn, prevented FWS from taking further steps required under the ESA to ensure the Northern Corridor Highway ROW neither jeopardizes the survival of the Mojave desert tortoise nor destroys or adversely modifies its critical habitat.

199.    Accordingly, the Court should hold that FWS's 2025 Northern Corridor Biological Opinion and Incidental Take Statement are arbitrary, capricious, an abuse of discretion, not in accordance with ESA and the APA, and therefore must be reversed, set aside, and vacated under the APA, 5 U.S.C. § 706(2)(A), (D).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

A.    Order, adjudge, and declare that Defendants' 2026 Decision Record approving the Northern Corridor ROW violated the Omnibus Public Land Management Act, the Land and Water Conservation Fund Act, NEPA, and the APA, and/or their implementing regulations;

B.    Order, adjudge, and declare that Defendants' 2024 HCP Biological Opinion and Incidental Take Statement violated the ESA and implementing regulations, and the APA;

C.    Order, adjudge, and declare that Defendants 2025 Northern Corridor Biological Opinion and Incidental Take Statement violated the ESA and implementing regulations, and the APA;

D.    Reverse, hold unlawful, set aside, and vacate the issuance of the 2026 Decision Record and Northern Corridor ROW;

E.    Reverse, hold unlawful, set aside, and vacate the issuance of the 2024 HCP Biological Opinion;

F.    Reverse, hold unlawful, set aside, and vacate the issuance of the 2025 Northern Corridor Biological Opinion;

G.    Enter such preliminary and/or permanent injunctive relief as Plaintiffs may specifically request hereafter;

H.    Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees

associated with this litigation under the Equal Access to Justice Act, 28 U.S.C. §§ 2412 *et seq.*,

the Endangered Species Act, 16 U.S.C. § 1540(g), and/or all other applicable authorities; and/or

     I.       Grant such other and further relief as the Court deems just and proper.


Dated: February 4, 2026          Respectfully submitted.

                       /s/ Todd C. Tucci
                       Todd C. Tucci (D.C. Bar # ID0001)
                       Hannah A. Goldblatt (OR Bar # 205324)*
                       Andrew Hursh (MT Bar # 68127109)*
                       *Pro hac vice motion forthcoming*
                       ADVOCATES FOR THE WEST
                       P.O. Box 1612
                       Boise, ID 83702
                       (208) 342-7024
                       ttucci@advocateswest.org
                       hgoldblatt@advocateswest.org
                       ahursh@advocateswest.org

                       *Attorneys for Plaintiffs*

COMPLAINT — 60