## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CONSERVE SOUTHWEST UTAH, *et al.*,

        *Plaintiffs*,

    v.

U.S. DEPARTMENT OF THE INTERIOR,
*et al.*,

        *Defendants*.

Civil Action No. 26-317 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

In our democratic system, federal agencies often and appropriately change policies across presidential administrations, as election results yield new political leadership with differing priorities and values.  That authority to change course is not, however, unlimited.  First and most obviously, an agency may exercise its discretion only within the limits set by Congress.  Second, even when no statute forecloses an agency's new policy choice, the familiar "requirement that an agency provide reasoned explanation for its action" obliges the agency to "show that there are good reasons for the new policy" and to provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."  *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).  The primary question before the Court is whether, in this case, the challenged agency action is consistent with those basic tenets of administrative law.

Plaintiffs Conserve Southwest Utah, the Conservation Lands Foundation, the Center for Biological Diversity, the Southern Utah Wilderness Alliance, the Wilderness Society, and WildEarth Guardians bring this suit against the United States Department of the Interior

("Department" or "Secretary") and its constituent agencies the Bureau of Land Management ("BLM" or "Bureau") and the Fish and Wildlife Service ("FWS")—collectively, "Federal Defendants"—challenging the Bureau's Record of Decision ("ROD" or "Decision") granting a right of way ("ROW") to the Utah Department of Transportation ("UDOT") to construct a highway across the Red Cliffs National Conservation Area in southwest Utah. The ROW at issue, intended for the construction of a "Northern Corridor" highway in Washington County, Utah, has been the subject of repeated consideration and contestation between the Department, the State of Utah, the plaintiff environmental organizations, and other parties.

The Bureau approved a functionally identical project in January 2021, *see* Dkt. 14-4, which Plaintiffs challenged in this Court, *see Conserve Sw. Utah v. U.S. Dep't of Interior*, No. 21-cv-1506 (D.D.C.) ("*Conserve Sw. Utah I*"). The Department settled that case before the Court reached the merits of the dispute, agreeing to remand the decision to the Bureau for further consideration. *See Conserve Sw. Utah I*, No. 21-cv-1506, 2023 WL 7922785, at *9 (D.D.C. Nov. 16, 2023). Following that remand, in 2024 the Bureau decided to terminate the 2021 ROW grant and, instead, "endorsed"—without actually approving—an alternative highway route in Washington County. *See* Dkt. 14-1. In 2025, however, the Bureau once again reopened the process and, in January 2026, issued a superseding decision reversing the 2024 Decision and restoring the Northern Corridor ROW grant. *See* Dkt. 14-2.

Plaintiffs now challenge the January 2026 Decision approving the Northern Corridor ROW and related assessments and findings. *See* Dkt. 1 (Compl.). The ultimate merits of Plaintiffs' challenge is a question for another day. But because construction on the project is slated to begin in early March, Plaintiffs now move for a preliminary injunction to prevent any immediate disturbance to the Red Cliffs National Conservation Area and, more particularly, any

irreparable damage to the threatened Mojave desert tortoise and its critical habitat.[1]  *See* Dkt. 13. Although Plaintiffs' complaint includes several counts, for purposes of the pending motion for a preliminary injunction they focus on just three claims.  First, they argue that the Bureau's approval of the Northern Corridor ROW violates the Omnibus Public Land Management Act ("OPLMA" or "Act"), 16 U.S.C. § 460www, which is the statute governing the Department's management of the Red Cliffs National Conservation Area.  Second, they contend that the Bureau did not adequately explain the reversal of its prior conclusion that the Northern Corridor project was unlawful in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et*. *seq*.  Third, they maintain that the Bureau's approval of the Northern Corridor ROW violates Section 7 of the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. § 1536.

Because the Court concludes that Plaintiffs have demonstrated a likelihood of success on at least the first two of those claims and have shown that the other relevant factors for a preliminary injunction are satisfied, the Court will **GRANT** Plaintiffs' motion for a preliminary injunction.  The Court will, however, also set an expedited schedule to resolve the case on the merits, thereby limiting the need for an extended period of preliminary relief.

## I. BACKGROUND

### A.    The Endangered Species Act

Congress enacted the ESA "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved" and "to provide a program for the conservation of such endangered species and threatened species."  *Id.* § 1531(b).  Under

---

[1] The parties originally reported that construction activities would begin on February 23, 2026. Dkt. 15 at 2.  At the hearing held on February 20, 2026, however, counsel for UDOT represented that the State had agreed to delay a further week, until March 2, 2026, to give this Court further time to issue its decision on Plaintiffs' motion.  Feb. 20, 2026 Hrg. Tr. (Rough at 100).

the statute, a protected species may be classified as "endangered," meaning "in danger of extinction throughout all or a significant portion of its range," *id.* § 1532(6), or "threatened," meaning "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range," *id.* § 1532(20).  Section 9 of the ESA prohibits any person, including private parties, States, and federal agencies, from "taking" a protected species.  *Id.* § 1538(a)(1)(B).  To "take" a species means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct," *id.* § 1532(19), which may include "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding[,] or sheltering," 50 C.F.R. § 17.3.  Section 7 of the Act "affirmatively command[s] all federal agencies," *TVA v. Hill*, 437 U.S. 153, 173 (1978), to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [the critical] habitat of such species," 16 U.S.C. § 1536(a)(2).

The ESA protections relevant to this case are administered by the FWS, a component of the Department of the Interior.  *See Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 511 U.S. 644, 651 (2007).  To comply with Section 7 of the ESA, federal agencies must review their proposed actions to "determine whether any action may affect listed species or critical habitat." 50 C.F.R. § 402.14(a).  If the agency determines that no adverse effect is likely, no further consultation is required.  *Id.* § 402.14(b)(1).  But if the agency comes to the contrary conclusion, it must proceed to consultation with the FWS—the "consulting agency."

"Broadly speaking, the object of consultation under the statute is for the [consulting] agency to determine whether the project will violate [Section 7's] prohibition on jeopardizing the

continued existence of endangered and threatened species." *Ctr. for Biological Diversity v. Ross*, 613 F. Supp. 3d 336, 339 (D.D.C. 2020).  Following the consultation process, the FWS must issue a biological opinion, or "BiOp," that "set[s] forth [its] opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat."  16 U.S.C. § 1536(b)(3)(A).  If the FWS determines that the action at issue is "[l]ikely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat," it issues a "'jeopardy' biological opinion."  50 C.F.R. § 402.14(h)(1)(iv)(A).  If it finds otherwise and issues a "'no jeopardy' biological opinion," *id.* § 402.14(h)(1)(iv)(B), the FWS may nonetheless conclude that some take of the threatened species is "reasonably certain to occur," *id.* § 402.14(g)(7).  In that case, the FWS must provide an incidental take statement ("ITS").  16 U.S.C. § 1536(b)(4).  The ITS specifies the impact of an incidental taking, the "reasonable and prudent measures [deemed] necessary or appropriate to minimize such impact," and "the terms and conditions . . . that must be complied with . . . to implement th[ose] measures."  *Id.*

Similar conditions apply when the entity seeking permission to take a protected specifies is not a federal agency.  Section 10 of the ESA provides that the FWS may issue a permit for an otherwise prohibited taking "if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity."  *Id.* § 1539(a)(1)(B).  Applicants for such "incidental take permits" must submit a "Habitat Conservation Plan" (HCP) that describes the impact of such a taking, the steps that will be taken to mitigate those impacts, any considered (and rejected) alternatives, and other measures that the FWS "may require as being necessary or appropriate."  *Id.* § 1539(a)(2)(A).

**B.**      **The Red Cliffs National Conservation Area and its Tortoises**

The Mojave desert tortoise is "a species of slow-moving reptile," *Conserve Sw. Utah I*,

2023 WL 7922785, at *1, that is listed as a threatened species under the ESA, Endangered and

Threatened Wildlife and Plants; Determination of Threatened Status for the Mojave Population

of the Desert Tortoise, 55 Fed. Reg. 12178, 12178–91 (Apr. 2, 1990) (codified at 50 C.F.R.

§ 17.11(h) tbl). In 1994, the FWS designated critical habit for the imperiled testudines pursuant

to the Section 7 of the ESA, including 54,600 acres of contiguous critical habitat in the Upper

Virgin River Recovery Unit, which is primarily located in Washington County in southwestern

Utah. Endangered and Threatened Wildlife and Plants; Determination of Critical Habitat for the

Mojave Population of the Desert Tortoise, 59 Fed. Reg. 5820, 5827 (Feb. 8, 1994); *see also* Dkt.

1 at 21 (Compl. ¶ 67); Dkt. 8-2 at 3 (Rognan Decl. ¶ 6). In 1996, the FWS issued to Washington

County an incidental take permit authorizing "takings" of the Mojave desert tortoise associated

with certain covered activities. Dkt. 8-2 at 4 (Rognan Decl. ¶ 7). In order to obtain that permit,

the County submitted a Habitat Conservation Plan that created the Red Cliffs Desert Reserve, a

61,022-acre area, divided into five zones, within which tortoise preservation was prioritized and

only a "very limited set of activities . . . could occur." *Id.* at 3–4 & 3 n.1 (Rognan Decl. ¶¶ 6–7).

The 1996 Incidental Take Permit ran until March of 2016. *Id.* at 5 (Rognan Decl. ¶ 9)

In 2009, Congress enacted the OPLMA, Pub. L. No. 111-11, 123 Stat. 991 (2009).

Among other provisions, the OPLMA created the Red Cliffs National Conservation Area ("Red

Cliffs NCA") in southwest Utah. *Id.* § 1974, 123 Stat. 1081–83 (codified at 16 U.S.C.

§ 460www). The Red Cliffs NCA encompasses approximately 60,000 acres in Washington

County, Utah, a majority of which is owned by the Bureau of Land Management, and a majority

of which is also part of the Red Cliffs Desert Reserve. Dkt. 1 at 18 (Compl. ¶ 54); Dkt. 8-2 at 4–

5 (Rognan Decl. ¶ 8). Approximately 46,000 acres of the Mojave desert tortoise's critical habitat

is located within the boundaries of the Red Cliffs NCA, Dkt. 14-3 at 111, including the portion of the NCA at issue in this litigation.

The OPLMA directs that "[t]he Secretary shall manage [Red Cliffs NCA] in a manner that conserves, protects, and enhances the resources of the National Conservation Area." 16 U.S.C. § 460www(e)(1)(A). The statute further provides, moreover, that "[t]he Secretary shall only allow uses of the [Red Cliffs NCA] that the Secretary determines would further a purpose described in subsection (a)" of the statute. *Id.* § 460www(e)(2). Subsection (a), in turn, specifies two purposes: first, "to conserve, protect, and enhance for the benefit and enjoyment of present and future generations the ecological, scenic, wildlife, recreational, cultural, historical, natural, educational, and scientific resources of [the Red Cliffs NCA]," and, second, "to protect each species that is[] located in [the Red Cliffs NCA]; and [is] listed as a threatened or endangered species." *Id.* § 460www(a). Notably, that later purpose includes protecting the threatened Mojave desert tortoise.

The OPLMA also includes a separate provision titled "Washington County Comprehensive Travel and Transportation Management Plan." OPLMA § 1977, 123 Stat. 1088–91. Section 1977(b) directs the Secretary, "in consultation with appropriate Federal agencies and State, tribal, and local governmental entities, and after an opportunity for public comment," to "develop a comprehensive travel management plan for the land managed by [the Bureau] in [Washington] County,' "[n]ot later than 3 years after the date of enactment of [the OPLMA]." *Id.* § 1977(b)(1). The Secretary has yet to come forward with this plan, even though the deadline passed well over a decade ago. Dkt. 8-1 at 23 n.19; Dkt. 13-1 at 37 n.6. Much of the debate in this case nonetheless centers on the next paragraph of Section 1977(b), which provides as follows: "In developing the travel management plan, the Secretary shall[,] in consultation with

appropriate Federal agencies, State, tribal, and local governmental entities (including [Washington County]), and the public, *identify 1 or more alternatives for a northern transportation route in the County*."  OPLMA § 1977(b)(2)(A) (emphasis added).

## C.    Procedural History

The original iteration of the project at issue in this case began in 2018, when UDOT submitted an application to the Bureau for an ROW grant for the "Northern Corridor Highway" to be built through the Red Cliffs NCA.  Dkt. 1 at 27 (Compl. ¶ 81); Dkt. 8-1 at 24.  Two years earlier, the Bureau had released a Resource Management Plan for the Red Cliffs NCA, which rejected a similar proposed highway route as inconsistent with "the conservation purposes of [the Red Cliffs NCA]" and a threat to "many resource values, including threatened and endangered species."  Dkt. 14-21 at 11.  A 2015 FWS analysis of that proposed "northern transportation route" noted that the proposed highway ran through "the largest section of contiguous habitat with the highest densities of tortoises in the Red Cliffs Desert Reserve," which was "of paramount importance to the success of the Red Cliffs Desert Reserve and the viability of the Upper Virgin River desert tortoise recovery unit."  Dkt. 14-7 at 2–3.  The report concluded that the construction corridor was "inconsistent with [the Red Cliffs NCA] because the construction and operation of a multi-lane highway would have significant negative impacts to desert tortoises, their habitat, and the ecological functioning of the Red Cliffs Desert Reserve."  *Id.* at 8.

Those less-than-supportive prior findings notwithstanding, in June 2020 the Department released a draft Environmental Impact Statement ("EIS") that proposed issuing a 30-year, renewable ROW grant for a 4-lane highway and accompanying trails, drainage, communications infrastructure, etc. through the Red Cliffs NCA.  Dkt. 1 at 27 (Compl. ¶ 83).  The draft EIS was followed by a final 2020 EIS analyzing various alternatives, including UDOT's ROW application.  *See* Dkt. 14-3.  In January 2021, the Bureau issued a ROD approving the issuance

of UDOT's ROW application. *See* Dkt. 14-4. In that decision, the Bureau concluded that approval of the ROW gave effect both to Section and to Section 1977 of the OPLMA because the ROW would "further[] the recreational, scenic, and educational purposes of the NCA," as required by Section 1974, while also identifying a "northern transportation route," as required by Section 1977. *Id.* at 11. Moreover, even if "inconsistent with BLM's prior interpretations of . . . Sections 1974 and 1977," the Bureau asserted that its decision was "consistent with a plain reading of the statute and the principles of statutory construction because it [gave] meaning to both Sections at issue." *Id.* at 11 n.1. The Bureau's approval of the ROW application also required amending the Red Cliffs NCA Resource Management Plan. *See* Dkt. 14-3 at 12.

As part of the process for obtaining the ROW, Washington County adopted an amended Habitat Conservation Plan that addressed both the Northern Corridor Highway and associated mitigation measures. Dkt. 1 at 30–31 (Compl. ¶ 98); Dkt. 8-1 at 18; *see* Dkt. 14-8. The primary proposed mitigation measure for the highway's adverse impact on the tortoise population was to establish a new "Zone 6" of the Red Cliffs Desert Reserve, located southwest of the existing Reserve. Dkt. 14-8 at 18. In January 2021, the FWS issued an updated BiOp analyzing the County's amended Habitat Conservation Plan. *See* Dkt. 14-23. The updated BiOp concluded that the amended plan was "not likely to jeopardize the continued existence of the desert tortoise," *id.* at 66, acknowledging that the highway project "would result in some habitat loss and fragmentation" but determining that it would be "offset" by the new Zone 6 and other conservation measures, *id.* at 67. The FWS then approved a new 25-year Incidental Take Permit for the County. Dkt. 8-2 at 5 (Rognan Decl. ¶ 11).

Plaintiffs challenged the 2021 ROW approval in this Court in a suit brought against the Department and its component agencies. *See* Compl., *Conserve Sw. Utah I*, No. 21-cv-1506

(D.D.C. June 3, 2021) (Dkt. 1); Am. Compl., *Conserve Sw. Utah I*, No. 21-cv-1506 (D.D.C. July 27, 2021) (Dkt. 16).  With leave of Court, UDOT and Washington County intervened as defendants in that action.  *Conserve Sw. Utah I*, No. 21-cv-1506, 2021 WL 8323601, at *1 (D.D.C. July 27, 2021).  After plaintiffs moved for summary judgment, the federal defendants in that action requested that the Court remand the case to permit the Department to reconsider "several decisions associated with [the] right-of-way grant to the Utah Department of Transportation" and that the Court vacate the ROW pending that further administrative consideration.  Mot. for Voluntary Remand, *Conserve Sw. Utah I*, No. 21-cv-1506 (D.D.C. May 22, 2023) (Dkt. 53).  Although the plaintiffs and federal defendants entered a settlement agreement, under which plaintiffs agreed either to join the motion to remand or to file a response in support of the motion and under which the parties agreed to certain ground rules relating to the renewed administrative proceedings, *see* Dkt. 14-13, the intervenors opposed the federal defendants' motion and "urge[d] the Court to proceed to summary judgment instead," *Conserve Sw. Utah I*, 2023 WL 7922785, at *1.  The Court, in turn, granted in part and denied in part the federal defendants' motion and, despite the federal defendants' request that the Court vacate the ROW approval, remanded the proceedings without vacatur of any of the challenged agency actions.  *Id.* at *5, *9.

On remand, the Bureau and the FWS issued a supplemental Environmental Impact Statement evaluating the effects of the proposed highway project, including discussing the impact of recent wildfires and the growth of invasive species in the Mojave Desert.  Dkt. 14-12 at 5.  In light of that analysis, the Bureau then issued a decision terminating the previously granted ROW.  *See* Dkt. 14-1.  The Bureau determined that its prior decision granting UDOT's ROW application did "not comply with [the] OPLMA's mandate that" the Secretary manage the

Red Cliffs NCA in a manner that promotes "the conservation, protection, and enhancement of threatened and endangered species." *Id.* at 20. "Terminating the UDOT ROW," the Bureau further explained, "would prevent the fragmentation of more than 2,300 acres of critical tortoise habitat in the NCA." *Id.* Having rejected UDOT's preferred Northern Corridor route, the Bureau endorsed an alternative road project, the "Red Hills Parkway Expressway," which would convert an existing highway into a "grade-separated expressway" using an ROW already held by the City of St. George, *see id.* at 9–10, and which "would result in no designated critical tortoise habitat being lost or fragmented," *id.* at 21. The decision acknowledged, however, that UDOT had "raised concerns about the technical feasibility of" the Red Hills Parkway Expressway route. *Id.* at 25. The FWS also rescinded its prior BiOp, issued an amended BiOp, and amended the Washington County ITP to reflect the change of plan. Dkt. 8-2 at 14 (Rognan Decl. ¶ 32).

Less than a year later, the Bureau once again reconsidered its position, and, in October 2025, it released a draft Environmental Assessment ("EA") "follow[ing] the receipt of additional information submitted by UDOT that demonstrates the technical and economic infeasibility of the Red Hills Parkway Expressway Alternative." Dkt. 14-14 at 3. The draft EA explained that the Red Hills Parkway Expressway's "proposed design" for the connection to Interstate 15 "does not conform to Federal Highway Administration (FHWA) requirements for interstate configurations," because the proposed interchange would not allow eastbound travelers on Red Hills Parkway to connect to southbound Interstate 15, or for northbound Interstate 15 travelers to go westbound on the Red Hills Parkway. *Id.* at 9. "Because "[t]he FHWA is responsible for Interstate 15[,] UDOT would be required to consult and [to] obtain approval of an Interchange Access Change Request from the FHWA due to physical constraints in the area." *Id.* Expanding the interchange to remedy those difficulties, moreover, "would require a substantially larger

footprint than was assumed for the Red Hills Parkway Expressway alternative . . . and may not even be possible to accommodate given the existing space constraints." *Id.* The draft EA also expressed concerns with the planned speed limit for the Red Hills Parkway Expressway, the need to acquire many additional properties, and the substantially higher cost of the necessary road upgrades. *Id.* at 10–11.

Shortly afterwards, on November 25, 2025, the FWS issued an updated BiOp supportive of the UDOT's proposed Northern Corridor project. *See* Dkt. 14-5. The FWS concluded that the project was "not likely to jeopardize the continued existence of the [Mojave] desert tortoise in the [Upper Virgin River Recovery Unit]" and was "not likely to destroy or adversely modify designated critical habitat." *Id.* at 76. The BiOp estimated that, during construction, approximately 6 adult Mojave desert tortoises would be killed or injured, while around 100 harder-to-detect juvenile and hatchling tortoises would suffer the same fate. *Id.* The BiOp also anticipated that 7 tortoises a year would be injured or killed annually from the use of the highway, resulting in a further 210 casualties over the 30-year initial term of the ROW. *Id.* Because those losses represented less than one percent of the threatened tortoises in the Upper Virgin River Recovery Unit, the FWS concluded that it "d[id] not expect the lethal take of desert tortoises from the highway to appreciably affect both the survival and recovery of desert tortoises in the wild by reducing the reproduction, numbers, or distribution of the species in the [Upper Virgin River Recovery Unit] or rangewide." *Id.*

The BiOp further concluded that proposed action would cause the loss or degradation of "approximately 6.1 percent of critical habitat in the total [Red Cliffs Tortoise Conservation Area]." *Id.* at 68. The FWS acknowledged that the Northern Corridor Highway would "bisect[] an important high-density area in the [Upper Virgin River Recovery Unit]," *id.* at 77, but noted

that the proposed project included at least eight dedicated passages for tortoises, along with

continued monitoring by UDOT, *id.*  Moreover, although 2,608 acres of critical habitat would be

"fragmented and degraded" by the proposed Northen Corridor ROW, and around 275 acres of

critical habitat would be lost, the Bureau and Utah proposed to offset that loss of critical habitat

by protecting an additional 6,813 acres of tortoise habitat in the new Zone 6.  *Id.* at 77–78.  Zone

6, however, would fall outside the existing critical habitat designation.  *Id.* at 33 fig. 4.



*Figure 1: A map of the Red Cliffs Desert Reserve, showing the proposed Northern Corridor Highway and Zone 6.  Dkt. 13-1 at 19 fig. 1.*



*Figure 2: A map showing the proposed Northern Corridor Highway's route (pink) through the Red Cliffs Desert Reserve.  Dkt. 13-4 at 20 (LaRule Decl. ¶ 51)*

Following the November 2025 BiOp, on January 21, 2026, the Bureau issued a final EA, *see* Dkt. 14-15, and a final ROD approving the Northern Corridor Highway project, *see* Dkt. 14-2.  The ROD concluded that the Northern Corridor ROW complied with the OPLMA—which, as discussed above, permits only those uses of the Red Cliffs NCA that "would further a purpose" of the statue, 16 U.S.C. § 460www(e)(2)—because the project would "enhance" the "recreation, scenic and educational resources" of the NCA by including a new hike and bike path and "additional interpretive displays that inform the public about the history and other purposes of the NCA," Dkt. 14-2 at 5.  The Bureau also noted that Section 1977 of the OPLMA directed the Secretary to "identify 1 or more alternatives for a *northern* transportation route in [Washington]

14

County," *id.* (quoting OPLMA § 1977(b)(2)(A)) (emphasis and alteration in original), and explained that:

> Therefore, the BLM understands Section 1977 to instruct the agency to identify and consider a[n] ROW in the NCA and to permit it to authorize such a route through the NCA—even if it may impact some purposes for which the NCA was designated—because there is no other viable BLM-administered land that can reasonably support a[n] ROW of this size or meet the Applicant's needs in northern Washington County.

*Id.* On February 4, 2026, Plaintiffs filed this suit against the Federal Defendants. *See* Dkt. 1 (Compl.). UDOT and Washington County ("Intervenors") timely moved to intervene as of right under Federal Rule of Civil Procedure 24, *see* Dkt. 8, and the Court granted that motion, Min. Order (Feb. 12, 2026).

Plaintiffs assert the following claims, all brought under the APA:

*First*, Plaintiffs allege that the reissuance of the ROW violates the OPLMA because the Northern Corridor project would not "conserve, protect, and enhance the ecological, scenic, wildlife, recreational, cultural, historic, and natural resources within the Red Cliffs NCA" or "protect 'each' endangered or threatened wildlife species located within it." Dkt. 1 at 48–50 (Compl. ¶¶ 171–175) (Count I).

*Second*, they allege that the approval of the ROW violates the Land and Water Conservation Fund Act, 54 U.S.C. § 200301 *et seq. Id.* at 50–52 (Compl. ¶¶ 176–79) (Count II).

*Third*, they allege that the approval of the ROW was arbitrary and capricious because the Federal Defendants failed adequately to explain the basis for their decision to reverse their prior conclusion that the project was incompatible with the OPLMA. *Id.* at 52–53 (Compl. ¶¶ 180–83) (Count III).

*Fourth*, they allege that the ROW approval, along with the final EA, violated NEPA because the Department failed fully to consider the effects of the Northern Corridor ROW and

failed to prepare a supplemental Environmental Impact Statement to account for new information about "the continued decline and imperiled status of the Mojave desert tortoise." *Id.* at 53–55 (Compl. ¶¶ 184–89) (Count IV).

*Fifth*, they allege that the FWS 2024 BiOp and Incidental Take Statement violated the ESA because, among other reasons, it failed adequately to examine the effects of the Northern Corridor Highway, did not sufficiently explain its conclusion that the project would not adversely modify or destroy critical habitat, and failed properly to examine the efficacy of the proposed mitigation measures. *Id.* at 55–57 (Compl. ¶¶ 190–94) (Count V).

*Sixth and finally*, they allege that the FWS 2025 BiOp and Incidental Take Statement violate the ESA, for similar reasons. *Id.* at 57–59 (Compl. ¶¶ 195–99) (Count VI).

Plaintiffs request, among other relief, that the Court declare unlawful and vacate the 2026 ROW decision and the 2024 and 2025 BiOps. *Id.* at 59–60 (Compl.).

On February 10, 2026, Plaintiffs filed a motion for a preliminary injunction, asking the Court to enjoin "further ground disturbance associated with construction of the Northern Corridor Highway." Dkt. 13 at 1. "[T]o facilitate prompt resolution of this motion," Dkt. 13-1 at 33, Plaintiffs rely on only three of their claims for purposes of demonstrating a likelihood of success on the merits. Specifically, Plaintiffs argue that the ROW approval violated the OPLMA (Count I), that the Department had not adequately explained the basis for its reversal of its prior position (Count III), and that the 2025 BiOp's conclusion that the Northern Corridor Highway was not likely to jeopardize the continued existence of the Mojave desert tortoise or to destroy its critical habitat was arbitrary and capricious (Count VI). *Id.* at 33, 39, 43. Plaintiffs maintain that the Court's immediate intervention is required because even initial construction activities, such as erecting fencing to prevent the tortoises from entering the worksite or, eventually, attempting

to cross the highway, would in fact "cause irreparable harm to Mojave desert tortoises and their habitat" by making critical habitat inaccessible "and increasing stressful behavior and greater energy use." *Id.* at 53.

On the day after Plaintiffs moved for a preliminary injunction, the parties informed the Court that they had stipulated to a briefing schedule and that the Intervenors had agreed to refrain from any ground-disturbing activities until February 23. Dkt. 15 at 2. After the case was transferred to the undersigned, the Court held a status conference on February 13, 2026, at which the Court slightly modified the parties' stipulated briefing schedule.[2] Min. Entry (Feb. 13, 2026). The Court held a hearing on the motion on February 20, 2026, Min. Entry (Feb. 20, 2026), and the parties made further submissions on February 25, Dkt. 34, and February 26, Dkt. 35.

Plaintiffs' motion for a preliminary injunction is now ripe for decision.

## II. LEGAL STANDARD

To prevail on a motion for a preliminary injunction, the moving party must show (1) "that [it] is likely to succeed on the merits," (2) "that [it] is likely to suffer irreparable harm in the absence of preliminary relief," (3) "that the balance of equities tips in [its] favor," and (4) "that an injunction is in the public interest." *Glossip v. Gross*, 576 U.S. 863, 876 (2015) (quotation marks omitted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). For many years, the D.C. Circuit evaluated these factors on a "sliding scale." *See, e.g.*, *Davenport v. Int'l Bhd. of Teamsters*, 166 F.3d 356, 360–61 (D.C. Cir. 1999). In recent years, however, the circuit has noted that it is "questionable" whether "the sliding scale approach remains good law"

---

[2] This case was originally assigned to Judge Jackson, as a related case to *Conserve Sw. Utah I*, and was randomly reassigned only after Plaintiffs moved for a preliminary injunction, *see* Dkt. 17.

following the Supreme Court's formulation of the preliminary injunction factors in *Winter.*. *Clevinger v. Advoc. Holdings*, 134 F. 4th 1230, 1235, 1236 n.2 (D.C. Cir. 2025) (collecting cases). Although that question remains unresolved, it is clear, however, that the plaintiff's likelihood of success on the merits is a "key issue [and] often the dispositive one" at the preliminary injunction stage, *Greater New Orleans Fair Hous. Action Ctr. v. U.S. Dep't of Hous. & Urb. Dev.*, 639 F.3d 1078, 1083 (D.C. Cir. 2011), and "[w]hen a plaintiff has not shown a likelihood of success on the merits, there is no need to consider the remaining factors" for a preliminary injunction, *id.* at 1088. Similarly, "[a] movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction" regardless of the other three factors. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

When evaluating agency decisions under the APA, the district court "sit[s] as an appellate tribunal," *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1222 (D.C. Cir. 1993), to decide "as a matter of law [whether] the agency action is supported by the administrative record and is otherwise consistent with the APA standard of review," *Coal. for Common Sense in Gov't Procurement v. United States*, 821 F. Supp. 2d 275, 280 (D.D.C. 2011); *see also Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971). In short, it is the role of the administrative agency "to resolve factual issues" and "to arrive at a decision that is supported by the administrative record," while it is the role of the district court "to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Hi-Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 13, 18 (D.D.C. 2008) (quotation marks omitted) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir. 1985)).

In applying this standard, courts must adhere to both the limits and demands of judicial review of administrative action. On the one hand, it is not the Court's role to substitute its judgment for that of the agency, and that principle applies with particular force in a case, like this one, involving scientific analysis and "technical expertise." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 377 (1989); *see Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983) ("When examining this kind of scientific determination, . . . a reviewing court must generally be at its most deferential."). An agency is not required to explain its conclusions with crystalline clarity; rather, the APA requires only that the reviewing court be able "reasonably [to] discern[]" the "agency's path." *Alaska Dep't of Env't Conservation v. EPA*, 540 U.S. 461, 497 (2004) (citation omitted). On the other hand, it is the Court's job to ensure that the agency's action is "in accordance with law," 5 U.S.C. § 706(2)(A), and that the agency has "examine[d] the relevant data and [has] articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Although review of the agency's reasoned decision is deferential, when an agency "entirely fail[s] to consider an important aspect of the problem" at issue, the Court must set the agency's action aside as "arbitrary and capricious." *Id.*

## III. ANALYSIS

### A.    Standing

The Court must first ensure that Plaintiffs have Article III standing to bring the challenges at issue in this motion. In considering this question, the Court must decide whether Plaintiffs' claim of standing is supported in "the manner" and with the "degree of evidence" required at the particular "stage[] of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "On a motion for a preliminary injunction, a plaintiff need only be 'likely to be able to demonstrate standing at the summary judgment stage.'" *Centro de Trabajadores Unidos v.*

*Bessent*, ___ F.4th ___, ___, 2026 WL 503310, at *2 (D.C. Cir. Feb. 24, 2026) (quoting *Elec. Priv. Info. Ctr. v. U.S. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019)).  Here, Plaintiffs readily meet that standard.

As organizations, Plaintiffs may claim "associational" standing on behalf of their individual members if "(1) at least one of their members would have standing to sue in their own right, (2) the interests the members seek to protect are germane to their organizations' purposes, and (3) the members need not participate individually in the lawsuit."  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th 296, 305 (D.C. Cir. 2025); *see also* Dkt. 13-1 at 53 n.10 (referencing injury to Plaintiffs' members).  The last two criteria require only minimal discussion:  Plaintiff Conserve Southwest Utah's purpose of "protecting the natural resources and quality of life in Washington County, Utah," Dkt. 13-6 at 3 (Butine Decl. ¶ 8), for example, plainly relates to its members' asserted interests in preventing construction of the Northern Corridor Highway from unlawfully damaging the Red Cliffs NCA, and neither the claims asserted nor the relief sought in this suit will require individual participation, *see Ctr. for Biological Diversity v. EPA*, 861 F.3d 174, 182 (D.C. Cir. 2017).

The sole remaining question, therefore, is whether Plaintiffs' individual members possess Article III standing to bring this suit in their own right.  "Standing necessitates an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.'"  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 144 F.4th at 304 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)).  As a general matter, environmental plaintiffs have standing to challenge agency action when "they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity."  *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC),*

*Inc.*, 528 U.S. 167, 183 (2000) (citation modified).  Similarly, a plaintiff whose "interest[] in viewing the flora and fauna of the area would be harmed" by the challenged project possesses Article III standing to move forward with a suit.  *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009).  To take just one example from Plaintiffs' supporting declarations, Thomas J. Butine—a member of Conserve Southwest Utah, The Wilderness Society, the Conservation Lands Foundation and the Center for Biological Diversity, Dkt. 13-6 at 1 (Butine Decl. ¶¶ 3–4)—attests that he routinely hikes and rides his bicycle in Red Cliffs NCA (including "in the area that would be impacted by the Northern Corridor Highway's noise and scar"); that observing Mojave desert tortoises is a "cherish[ed]" and "special" part of such visits; and that his experiences would be "ruined" if the proposed highway were built, *id.* at 5–6, 8 (Butine Decl. ¶¶ 13–14, 18).  This testimony is sufficient to establish that Butine—and, by extension, Conserve Southwest Utah—has standing to bring this suit.[3]

**B.    Likelihood of Success on the Merits**

The Court next considers whether Plaintiffs are likely to succeed on the merits of any of their three highlighted claims.

1.    *The Omnibus Public Lands Management Act and the 2024 and 2026 Decisions*

Plaintiffs' first two claims concern the Federal Defendants' compliance with the OPLMA and the APA.  First, Plaintiffs argue that Bureau's approval of the ROW application violated the OPLMA's enumerated conditions on the management of Red Cliffs NCA.  Dkt. 13-1 at 33.  Second, they argue that the Bureau's 2026 conclusion that the Northern Corridor Highway

---

[3] "Because only one plaintiff must have standing," the Court need not further analyze the standing of each separate Plaintiff organization (or member) in order to proceed to the merits of the motion for preliminary injunction.  *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

complies with the OPLMA was an arbitrary, capricious, and unexplained departure from the agency's contrary conclusion in 2024. *Id.* at 39. Because both arguments turn on similar issues—including, most notably, whether the OPLMA authorized the Bureau to approve the proposed ROW for the Northern Corridor Highway—the Court will start by construing the relevant provisions of the OPLMA. In interpreting and seeking to reconcile those provisions, the Court "must exercise [its] independent judgment in deciding whether [the] agency has acted within its statutory authority" and "may not defer to [the] agency interpretation of the law simply because [the] statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024). The Court must, instead, apply the traditional tools of statutory interpretation and must endeavor to read the statute "so that effect is given to all its provisions, [and] so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation modified).

The Court begins, as it must, with the statutory text. *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). Plaintiffs' claims implicate two separate provisions of the Act. The first provision, Section 1974 of the statute, which is codified at 16 U.S.C. § 460www, establishes the Red Cliffs NCA and provides that "[t]he Secretary *shall* manage [the Red Cliffs NCA] in a manner that conserves, protects, and enhances the resources of the National Conservation Area," 16 U.S.C. § 460www(e)(1)(A), and, more specifically, that "[t]he Secretary *shall only allow* uses of the National Conservation Area that [he] determines would further a purpose described in subsection (a)" of Section 1974, *id.* § 460www(e)(2) (emphases added). The "purposes described in subsection (a)," *id.*, are, first, to "conserve, protect, and enhance for the benefit and enjoyment of present and future generations the ecological, scenic, wildlife, recreational, cultural, historical, natural, educational, and scientific resources of the National Conservation

Area," *id.* § 460www(a)(1), and, second, "to protect each species that is[] located in the National Conservation Area; and listed as a threatened or endangered species," *id.* § 460www(a)(2).

The second relevant provision, Section 1977 of the OPLMA, which is not separately codified, is captioned "Washington County Comprehensive Travel and Transportation Management Plan."  In relevant part, it provides that:

> Not later than 3 years after the date of enactment of this Act, in accordance with the Federal Land Policy and Management Act of 1976 (43 U.S.C. 1701 et seq.) and other applicable laws (including regulations), the Secretary, in consultation with appropriate Federal agencies and State, tribal, and local governmental entities, and after an opportunity for public comment, shall develop a comprehensive travel management plan for the land managed by the Bureau of Land Management in [Washington] County.

OPLMA § 1977(b)(1).  For the most part, the statutorily required elements of the plan are consistent with the purposes of the NCA.  The plan must, for example, provide the public with "a clearly marked network of roads and trails with signs and maps to promote . . . public safety and awareness" and to enhance "recreation and general access opportunities," and it must "promote citizen-based opportunities for . . . the monitoring and stewardship of the trail."  *Id.* § 1977(b)(1)(A), (C).  But Section 1977 also requires the Secretary, "in consultation with appropriate Federal agencies, State, tribal, and local governmental entities (including [Washington] County and St. George City, Utah), and the public, [to] *identify 1 or more alternatives for a northern transportation route* in [Washington] County."  *Id.* § 1977(b)(2)(A) (emphasis added).

At this preliminary stage of the proceeding, neither Plaintiffs, the Federal Defendants, nor the Intervenors have articulated a satisfactory construction of the statute and, in particular, how best to reconcile Section 1974's focus on protecting the NCA and any "threatened or endangered

species" located in that area with Section 1977(b)(2)(A)'s focus on a transportation route

involving "the land managed by the Bureau . . . in the County," OPLMA § 1977(b)(1).

Plaintiffs suggest that Section 1977(b)(2)(A) requires the Secretary merely to "identify" a

route, but not to approve one. Dkt. 13-1 at 37. As a result, if no route exists that is consistent

with the conservation mandate found in Section 1974, that is the end of the matter. To be sure,

the Secretary would have authority, in Plaintiffs' view, to approve an ROW, but only if the

project would further the purposes for which Congress created the NCA. *See id.* at 34. But none

of the purposes that the Secretary has identified for authorizing the construction of a commuter

highway satisfy this standard, and adorning the project with bike paths and information about the

NCA does not change the fact that construction of the highway will harm a threatened species

and will not protect or enhance the "ecological, scenic, wildlife, recreational, cultural, historic,

natural, educational, and scientific resources of the" NCA, 16 U.S.C. § 460www(a)(1). Dkt. 13-

1 at 35–36.

The Federal Defendants agree that Section 1977(b)(2)(A) does not *require* the Secretary

to approve a route, but they maintain that it does *allow* the Secretary to do so. Dkt. 24 at 13. It

does so, moreover, even if the proposed route "'may impact some purposes for which the NCA

was designated,'" so long as "there is no other *viable* BLM-administered land that can

reasonably support a[n] ROW" that satisfies "'the Applicant's needs.'" *Id.* at 13 n.2 (emphasis

added) (quoting 2026 ROD). When asked at the motion hearing to explain how the Federal

Defendants understand the "viability" standard, however, counsel demurred. Feb. 20, 2026 Hrg.

Tr. (Rough at 57–58). And, in the alternative, they argue that the Bureau "reasonably understood

that the right-of-way should be designed to be consistent with a purpose of the NCA" because

"the approved right-of-way will include a path for hiking and biking, as well as additional interpretative displays." Dkt. 24 at 13–14.

Finally, like the Federal Defendants, the Intervenors read Section 1977 to authorize the Secretary to "approve" *some* "feasible" route "through the NCA," Dkt. 22 at 27–29, even if "there is no option for a northern transportation route through the public lands in Washington County that would not have *some* impacts on tortoises and other resources," *id.* at 24 (emphasis in original). But like the Federal Defendants, they fail to explain what they mean by "infeasible" (difficult? costly? uncertain? impossible?) or the statutory foundation for that formulation of the test.

Although a close question, at this early stage of the proceeding, the Court tentatively construes the OPLMA as follows: To start, and most fundamentally, the Secretary must abide by the statutory directive to manage the NCA "in a manner that conserves, protects, and enhances the resources of the" NCA, 16 U.S.C. § 460www(e)(1); *see also id.* § 460www(a). That, after all, is what it means to manage a national conservation area. But by the same token, the Secretary must give some actual effect to the requirement that he identify "a northern transportation route in the County." OPLMA § 1977(b)(2)(A). It is fair to assume, moreover, that Congress did not intend for this to be a meaningless gesture and that Congress understood that a "northern transportation route"—that is, a commuter highway designed to reduce traffic congestion in Washington County—would not itself promote conservation of the NCA. Considering these premises together, this means—as the Bureau opined in December 2024—that the Secretary "must select" a route that could, in fact, be used to construct a highway, but it also means that he "must select the" route "that minimizes impacts on the NCA resources to be protected." Dkt. 14-1 at 19. Under this reading of the statute, the Secretary must evaluate

alternatives and, even if another route is more costly or involves more uncertainty, the Secretary must select the route that minimizes damage to the NCA's resources and endangered or threatened species.  Applying that standard here, the Court concludes that the 2026 ROD either misconstrues the OPLMA or fails to offer a reasoned explanation for its departure from the agency's 2024 standard and its approval of UDOT's ROW application.

**a.**

As an initial matter, the Court concludes that Section 1977, when read in conjunction with Section 1974, is best understood to envision the construction of a "northern transportation route" that, at least in part, may pass through portions of the Red Cliffs NCA.  It is true that, as Plaintiffs emphasize, the language of Section 1977 only provides that the Secretary shall "identify" such a route and does not expressly require the Secretary to "approve" an ROW that crosses the NCA.  Dkt. 13-1 at 37 (quoting OPLMA § 1977(b)(2)(A)).  But the Court is not persuaded by Plaintiffs' contention that Congress enacted Section 1977 merely to require the Secretary to "identify" one or more transit routes, while simultaneously ensuring, through the separate restrictions on the Secretary's management of the Red Cliffs NCA contained in Section 1974, that no such route could ever be built.  Moreover, given that Section 1977 expressly applies to "land managed by the Bureau of Land Management in [Washington] County," OPLMA § 1977(b)(1), and that at the time of the OPLMA's passage, "the only BLM-managed lands located north of the city of St. George in Washington County were those lands in the Reserve/Red Cliffs NCA," Dkt. 14-2 at 5, Congress must have contemplated that such a northern transportation route, were it to be built, would likely proceed through some portion of the newly designated National Conservation Area.

The fact that Congress permitted the Secretary to approve a northern transportation route does not, however, mean that Congress granted the Secretary unlimited discretion in doing so. Beyond the general background principle instructing the Court to reconcile different statutory provisions wherever possible, Congress included explicit limitations on how the Secretary could lawfully approve a project such as the Northern Corridor Highway. Section 1977 requires, for example, that the Secretary develop the long-awaited "comprehensive travel management plan," which Congress anticipated would include identifying the northern transportation route, "in accordance with the Federal Land Policy and Management Act of 1976 ["FLPMA"]." OPLMA § 1977(b)(1). In addressing the authorization of ROWs on public lands, the FLPMA directs the Secretary to "take into consideration national and State land use policies," 43 U.S.C. § 1763, and, more generally, requires the Secretary to manage public lands such as the Red Cliffs NCA "in accordance with" any law that "dedicate[s]" a specific "tract of . . . public land . . . to specific uses," *id.* § 1732(a). The Court concludes, accordingly, that Section 1977 does not grant the Secretary unchecked authority to approve the construction of a northern transportation route—or even to do so whenever it would not conflict with the general provisions of the FLPMA—but specifically directs that the Secretary's actions must be guided by the land-use restrictions found in Section 1974, which, in the language of the FLPMA, "dedicate[]" the Red Cliffs NCA "to specific uses." *Id.*

This analysis (at least nominally) aligns with the Federal Defendants' interpretation of the OPLMA, which concurs that the approval of the Northern Corridor Highway was contingent on compliance with Section 1974. Dkt. 24 at 13–14. The problem for the Federal Defendants is that the precise manner in which they envision the highway project complying with Section 1974 is either unconvincing or unexplained. In their view, the Bureau lawfully authorized UDOT's

ROW application because the agency concluded, as the statute requires for any "use" of the Red

Cliffs NCA, that the project would "further a purpose described in subsection (a)" of the statute.

16 U.S.C. § 460www(e)(2); *see also* Dkt. 24 at 13–14.  In the 2026 ROD, the Bureau explained

that the Northern Corridor furthered one or more of the purposes listed in Section 1974(a), which

include "to conserve, protect, and enhance for the benefit and enjoyment of present and future

generations the ecological, scenic, wildlife, recreational, cultural, historical, natural, educational,

and scientific resources of the National Conservation Area," 16 U.S.C. § 460www(a)(1), because

the project promises to "provid[e] a new paved hike and bike path for recreation and scenic

views that will benefit certain members of the public," and will "further the educational purpose

of the NCA by including additional interpretive displays."[4]  Dkt. 14-2 at 5.  The Bureau also

suggested that "[t]he new roadway will allow the public to experience views of the NCA beyond

what is currently available in limited areas" and would improve "[a]ccessibility for users who are

physically unable to use unpaved trails" by providing "the paved hike and bike path and new

scenic driving opportunities."  *Id.* at 12.

        As a matter of statutory interpretation, the Court is unpersuaded that the Secretary may

approve an ROW for a northern transportation route only if the proposed highway would further

the "recreational," "educational," or other purposes of Section 1974.  The Bureau's unpersuasive

(and almost certainly arbitrary and capricious) effort to shoehorn its approval of UDOT's ROW

application into one of these purposes merely demonstrates that conditioning approval of the

"northern transportation route" on furthering a purpose included in Section 1974(a) is an

_____

[4] The statute also includes a separate purpose of protecting threatened or endangered species in
the Red Cliffs NCA.  16 U.S.C. § 460www(a)(2).  For obvious reasons, neither the Federal
Defendants nor the Intervenors suggest that constructing a sizeable highway through critical
Mojave desert tortoise habitat furthers that purpose.

awkward fit at best.  As the Intervenors acknowledge with admirable candor, the essential

purpose of the Northern Corridor Highway, and of any other alternative potential northern

transportation route, is to address the County's transportation needs and to reduce traffic

congestion as Washington County's population continues to grow.  Dkt. 29-1 at 14–15.  No

matter how important, these aims have nothing to do with the statutory purposes for the Red

Cliffs NCA that Congress identified in Section 1974(a).  In this respect, Section 1977 of the

OPLMA is similar to the provision of the OPLMA that requires the Secretary to permit certain

livestock grazing within the NCA, 16 U.S.C. § 460www(e)(4).  As with grazing, it is implausible

that a highway will "further" the conservation and recreational purposes of the NCA, but because

Congress recognized that the Secretary may—with appropriate constraints—permit both

activities within the NCA, the Secretary need only ensure that the activities are conducted "in a

manner consistent with [those] purposes," *id.* § 460www(e)(4).  At least as to the statutorily

identified activities, including identifying a northern transportation route, the activities need not

"further"—that is, advance—the purposes set forth in Section 1974(a).

      To the degree that the Federal Defendants nonetheless understand the OPLMA to

condition authorization of such a project on the Department's conclusion that the highway would

"further" a separate statutory purpose, their construction of the statute merely invites pretextual

reasoning, as the record in this case shows.  Many of the Northern Corridor Highway's features

that supposedly "further" the recreational, cultural, and similar values of the NCA, such as the

"paved hike and bike path" and "interpretive displays that inform the public about the history

and other purposes of the NCA," Dkt. 14-2 at 5, 12, have nothing to do with the actual highway

construction that lies at the center of the project and the present dispute.  Building a bike path

might well further the purposes of Section 1974, but the Court is far from persuaded that

Congress intended to authorize the Bureau, for example, to authorize the construction of a shopping mall in the center of the Red Cliffs NCA even if that shopping mall includes a bike path between the mall and the parking lot, or even if the parking lot features informative "interpretive displays" for customers.  To the degree that the Federal Defendants maintain, as they did at the hearing before the Court, that the Northern Corridor Highway itself furthers a purpose of Section 1974 because commuters whizzing by at highway speeds might pause to savor the "scenic driving opportunities" provided by the project (hopefully, for the sake of their fellow motorists, without taking their eyes off the road), Dkt. 14-2 at 12, the Court is similarly unconvinced, *see* Feb. 20, 2026 Hrg. Tr. (Rough at 52–53).  That reading of subsections 1974(a) and (b) admits of no reasonable limits and would permit almost any development, based on little more than a minor recreational or educational add-on, in a region that Congress set aside for conservation.

The Court's disagreement with the Federal Defendants' first statutory theory amounts to the following:  If Section 1977 did not exist, it would be extremely difficult to convince the Court that constructing a major commuter highway through the critical tortoise habitat of the Red Cliffs NCA was consistent with the Secretary's obligations under Section 1974.  The same would be true if the Bureau were to grant an ROW for a highway that was unrelated to the "northern transportation route" referenced in Section 1977.  Doing so would not "further" one of the listed purposes of the NCA, 16 U.S.C. § 460www(e)(2), and would not satisfy the Secretary's obligation to "manage the National Conservation Area[] in a manner that conserves, protects, and enhances [its] resources," 16 U.S.C. § 460www(e)(1)(A).  Nor would adding "ancillary" and "auxiliary" features to such project redress this fundamental defect.  Dkt. 13-1 at 35.  Rather than contort Section 1974(a)'s mandates to somehow accommodate large highways

or other similarly disruptive projects, then, it makes better sense to consider the identification

(and, implicitly, the construction) of Section 1977's "northern transportation route" as a separate,

*sui generis* obligation on the Department, albeit an obligation that the Secretary must fulfill in a

manner that is consistent with his duty to conserve and protect the NCA and threatened and

endangered species that live there.

Considering Section 1974's general requirement to manage the Red Cliffs NCA "in a

manner that conserves, protects, and enhances [its] resources," 16 U.S.C. § 460www(e)(1)(A),

alongside Congress's apparent separate expectation that a major highway might be constructed

through the NCA, the Court concludes that the OPLMA permits the Secretary to authorize a

"northern transportation route" if and only if it does so in the manner that is least offensive to its

broader conservation obligations.  This construction of the statute aligns with the position taken

by the Bureau in the 2024 ROD, where the agency understood that it could "authorize such a

[northern transportation] route through the NCA" even where that authorization would, in the

Bureau's delicate phrasing, "impact some purposes that the NCA was designated to conserve and

protect," but that the Bureau must "select the [route] that minimizes impacts on the NCA

resources," which the Secretary is charged with "protect[ing]."  Dkt. 14-1 at 19.

That obligation includes two components relevant to this case.  The first, which requires

only brief discussion, is that the Secretary must ensure that the northern transportation route,

regardless of the precise location selected, is constructed and managed in a manner that

minimizes negative effects on the Red Cliffs NCA.  That question is not presently before the

Court, and perhaps for good reason, since the record refers to a variety of significant steps that

the Federal Defendants and the Intervenors have agreed to take to minimize the impact of the

Northern Corridor Highway's construction on the NCA, in general, and the Mojave desert

31

tortoise, in particular.  *See, e.g.*, Dkt. 29-1 at 47 (explaining how, as part of the Northern Corridor Highway project, "tortoise biologists walked the right-of-way as it was being staked to identify burrows," that the trained fencing crew would "avoid these burrows when installing the fencing," and that their work would "be accompanied by trained, licensed biologists who will monitor project activities, ensuring proper implementation of the conservation measures outlined in the Biological Opinion and minimizing take.").  But *how* that specific project is implemented is just one component of the relevant inquiry.

The second component of the inquiry—and the question that is presented in this case—turns on *where* the highway is located.  As the Bureau acknowledged in its 2024 ROD, the OPLMA requires the Secretary to choose a location for Section 1977's northern transportation route that "minimizes impacts" of the project on the natural resources and threatened and endangered species that the Secretary is required to protect.  Dkt. 14-1 at 19.  This requirement includes both a relative and absolute element.  First, as a *relative* matter, the Bureau may not select one proposed route that will cause damage to the NCA and the Mojave desert tortoise if another alternative would better "minimize[] impacts on the NCA resources to be protected."  *Id.* Second, as an *absolute* matter, it seems unlikely that the Bureau may approve a northern transportation route if that route would cause unacceptable levels of damage to the Red Cliffs NCA, even if there is no available alternative that would be less disruptive.  As the Federal Defendants stress, Section 1977 does not require the Secretary to approve an ROW for a northern transportation route but merely allows the Secretary to do so.  Dkt. 24 at 13.  It would seem to follow, then, that the Secretary may not exercise this *discretion* to approve a route, if doing so would collide with the Secretary's *mandate* to protect the NCA.

For present purposes, the Court can limit its analysis to the question of relative harm, which is sufficient to resolve the pending motion. As explained below, the Court concludes that Plaintiffs are likely to prevail in showing that the 2026 ROD's reading of the OPLMA is incorrect or that, at minimum, the Bureau has failed adequately to explain its reasoning and its basis for departing from the conclusions reached in the 2024 ROD.

**b.**

The 2024 ROD withdrew the Bureau's approval for the Northern Corridor Highway ROW because the Bureau understood that an alternative route—the Red Hills Parkway Expressway, which involved expanding an existing highway—would satisfy Washington County's transportation needs while also "avoid[ing] or minimiz[ing] impacts on the resources that the NCA was designated by Congress to conserve, protect, and enhance." Dkt. 14-1 at 11. The Bureau concluded, correctly, that the OPLMA did not permit it to authorize the Northern Corridor Highway if another route existed that better satisfied the statutory criteria. *Id.* at 19. The Bureau reconsidered that analysis in the 2026 ROD, but, in doing so, appears to have altered its interpretation of the OPLMA, albeit without saying so and without adequately explaining its reasoning.

In the 2026 ROD, the Bureau asserts that it has reconsidered the 2024 ROD because the former agency action "was based on a faulty factual premise; namely, that 'more than one viable route alternative' existed" for the northern transportation route envisioned by Section 1977. Dkt. 14-2 at 10. Specifically, the Bureau posits that "additional information provided by UDOT after finalization of the 2024 ROD demonstrates that the Red Hills Parkway Expressway alternative is not technically or economically feasible." *Id.* This language mirrors language included in the 2024 ROD, where the Bureau concluded that the OPLMA does not preclude the Secretary from

approving an ROW for a northern transportation route, "even if it may impact some purposes that the NCA was designated to conserve and protect—[if] there is no other viable BLM-administered land that can reasonably support" the necessary ROW.  Dkt. 14-1 at 19.

The difficulty—and the apparent shift in position—lies in the Bureau's understanding of "viability" or "technical or economic feasibility."  A statute that would permit the Secretary to approve a ROW that all agree will have some negative impact on the NCA's natural resources and on the Mojave desert tortoise, so long as that route would cost less or has been better-studied than an alternative route that would cause little or no damage, is very different from a statute that would permit the Secretary to approve the first route *only if* the second route faces known obstacles that would, in practice, preclude the ROW applicant from ever building that highway. In 2024, the Bureau was aware that the Red Hills Parkway Expressway would pose greater technical challenges than the proposed Northern Corridor Highway.  *See id.* at 25 (noting that UDOT "raised concerns about the technical feasibility of this alternative"); *see also* Dkt. 34; Dkt. 14-3 at 262–64; Dkt. 14-12 at 43.  The agency did not, however, suggest that those challenges— and the greater uncertainty related to the less developed project—meant that the Red Hills Parkway Expressway was not "viable."  The 2026 ROD, in contrast, treats similar (albeit slightly more developed) questions of "technical or economic feasibility" as decisive.  Dkt. 14-2 at 10. Both decisions, in short, treat "viability" as a relevant statutory criterion, but it is far from clear that they apply that critical term in the same manner and, more importantly, it is far from clear that the Bureau's current understanding of that implied statutory term is consistent with the statutory text or purpose.

Before turning to this question, the Court pauses to note that the Federal Defendants correctly observe that Plaintiffs do not bring an arbitrary and capricious challenge to the

Bureau's factual finding that the Red Hills Parkway Expressway route is not viable. But the Federal Defendants' retort sidesteps the relevant question, which does not turn on whether the agency's factfinding was arbitrary and capricious but, rather, turns on whether the agency's reading of the statute is contrary to law. Understanding what the agency did, in turn, elucidates how it construed the statute. This matters because Plaintiffs do challenge the Bureau's reading of the statute, and, in any event, the Court "must exercise [its] independent judgment in deciding whether [the] agency has acted within its statutory authority," *Loper Bright Enters.*, 603 U.S. at 412. Finally, the factual premise for the Bureau's "viability" determination bears directly on Plaintiffs' separate contention that the Bureau failed sufficiently to explain the basis for its change of position as to the Red Hills Parkway Expressway. Dkt. 13-1 at 40–41 (arguing that "the feasibility information was not new").

The central question, then, is what the Bureau now means when it asserts that the Red Hills Parkway Expressway alternative is not "viable" or "technically and economically feasible." One need look no further than oral argument in this case to recognize that this is not an easy question. When the Court asked counsel for the Federal Defendants to explain how the Bureau understood the term, he was unable to do so. *See* Feb. 20, 2026 Hrg. Tr. (Rough at 57–58). The 2026 ROD, for its part, states only in a conclusory fashion that "additional information provided by UDOT . . . demonstrates" the alternative route's nonviability, with minimal additional detail. Dkt. 14-2 at 10. Indeed, the only hint that the ROD provides regarding what the Bureau means when it says that the Red Hills Parkway Expressway is not "viable" can be found in the ROD's cross-reference to the agency's 2026 EA. *See id.*

The 2026 EA, in turn, asserts that "[t]he design and potential implementation of [the Red Hills Parkway Expressway] alternative has severe technical and economic challenges." Dkt. 14-

15 at 10.  The EA then explains that these "challenges" include the following concerns: the

design of a highway interchange with Interstate 15 that "*may not* even be possible to

accommodate given the existing space constraints," *id.* (emphasis added); the route would

present other potential incompatibilities with federal and state highway standards relating to

speed limits, *id.* at 11; to build the Expressway, UDOT would need to acquire, in whole or in

part, and to relocate some existing properties, some of which "*may not* be technically feasible to

relocate," *id.* (emphasis added); and, overall, constructing the Expressway would cost $475

million, "which is more than double the cost of the other viable alternatives," *id.*  In light of the

new information provided by UDOT, and because the National Environmental Policy Act

("NEPA") requires that any agency only analyze "technically and economically feasible"

alternatives, *see* 42 U.S.C. § 4332(C),[5] the Bureau declined to carry out a "detailed analysis" of

the Expressway alternative.  Dkt. 14-15 at 12.

    The picture is not meaningfully clarified by reference to UDOT's 2025 correspondence

with the Bureau seeking reconsideration of the 2024 ROD, which included a "technical

memorandum" analyzing the Red Hills Parkway Expressway alternative.  *See* Dkt. 24-1 at 15.

That memorandum begins by acknowledging that the Red Hills Parkway Expressway alternative

"is a very high-level design (less than 20% complete)," and that, therefore, "there are many

issues related to [its] design, operations, and feasibility . . . that are *yet to be investigated*."  *Id.*

(emphasis added).  It nonetheless goes on to claim that, based on currently available information,

the Red Hills Parkway Expressway "is not technically or economically feasible."  *Id.*  The

---

[5] The conclusion that no further analysis was required under NEPA, of course, says nothing
about the meaning of the OPLMA.  It appears, however, that the Bureau may have borrowed the
"technical infeasibility" standard from NEPA, despite the absence of any similar test in the
OPLMA.  Dkt. 14-15 at 12 (citing NEPA).

specific analysis in support of that conclusion is, however, tentative and necessarily uncertain. The memorandum notes, for example, that "[t]rying to determine a cost associated" with acquiring necessary properties "is problematic, at best, as options to limit the impacts *cannot be investigated at this stage of the evaluation due to the time and expense involved*," *id.* at 16 (emphasis added), and then goes on to attempt to estimate the general cost of doing so, with the qualification that "[t]he ability to relocate" many of the affected entities "is unknown at this point," *id.*  Similarly, the memorandum notes that the Expressway would "affect[]" many local accesses, and that offering alternative access "would most likely require some type of frontage road concept or providing new access routes . . . which may infringe upon the Red Cliffs Desert Reserve." *Id.* at 17.  As for environmental effects, in the absence of "more detailed environmental analysis, there is no understanding of what type, amounts, extents, or timing of measures that may be required," and, "[t]herefore, environmental mitigation costs and other elements associated with potential environmental mitigation requirements are unknown." *Id.* at 18.  The interchange with I-15 would also raise a host of questions and would require applications, approvals, and consultation with other agencies, and it is "unknown" whether UDOT would receive those approvals. *Id.*  The memorandum concludes that, given "the lack of understanding of all the details associated with the [Red Hills Parkway Expressway]," "not enough design, studies, evaluations, [or] analyses have been conducted . . . *to allow for an informed decision about the viability, feasibility, costs, and benefits* of the [Red Hills Parkway Expressway] alternative." *Id.* at 19 (emphasis added).

The uncertainty emphasized by the 2026 EA and the UDOT technical memorandum would likely support a strong challenge to a hypothetical Bureau decision approving the Red Hills Parkway Expressway without further investigation.  But that is not the question before the

Court, or the question that was before the Bureau. Instead, the question posed by UDOT's request that the Bureau reconsider the 2024 ROD, and by Plaintiffs' challenge to the Bureau's approval of that request, is whether the OPLMA permits the Secretary to approve an ROW that bisects a critical portion of the Red Hills NCA, and that will negatively impact the resources of the NCA, based on the premise that "[t]here is no other viable BLM-managed land that can reasonably support a northern transportation route in the County," Dkt. 14-2 at 9, when the cost and difficulty of constructing the alternative route is unknown. Framed more generally, then, the question is whether the OPLMA is best construed to permit the Secretary to approve a northern transportation route that is at odds with the Secretary's general duty to manage the NCA "in a manner that conserves, protects, and enhances the resources of the" NCA, 16 U.S.C. § 460www(e)(1)(A), merely because much is unknown about an alternative route that would cause less harm, and it is possible that the alternative route might ultimately prove unachievable. At least at this preliminary stage of the case, the Court cannot answer in the affirmative. If "not technically or economically feasible" means uncertain, more costly, and administratively challenging—but not yet fully evaluated or foreclosed—the Court is unpersuaded that the OPLMA admits of such an exception to the Secretary's duty to preserve the NCA and the Mojave desert tortoise.

**c.**

In addition to this statutory hurdle, the Bureau's 2026 ROD fails adequately to explain the basis for its reversal of the 2024 ROD. To start, as noted above, the Bureau has failed to explain what it means by "infeasible" and how that criterion maps onto the statute. As explained above, the Bureau has yet to indicate, for example, whether its feasibility test permits the agency to weigh the loss of threatened species and critical habitat against increased construction costs,

administrative hurdles, and private displacement, and, if so, which considerations tip the scale in one direction or the other.  Or, alternatively, if the Bureau understands this test to require a determination that the burdens are so high that, as a practical matter, the "infeasible" alternative will never be built, the Bureau has not adequately elucidated how it made that determination here.  Without some further explanation—indeed, *any* meaningful explanation—the agency's invocation of "nonviability" or "infeasibility" cannot have talismanic effect.

Nor does the 2026 ROD adequately address what was before the Bureau in 2024 and what *new* information tipped the scales in the opposite direction in 2026.  The 2024 Decision acknowledged that UDOT had raised concerns about the "technical feasibility" of the Red Hills Parkway Expressway, yet the Bureau declined UDOT's request for an additional comment period addressing those issues.  Dkt. 14-1 at 25.  Many of the factors that the Bureau invokes in support of its 2026 ROD were in the record when the Bureau issued its 2024 ROD, *see*, *e.g.*, Dkt. 14-1 at 11 (noting that the Red Hills Expressway Highway "could have greater socio-economic and environmental justice impacts on private property within the highway corridor than" the Northern Corridor Highway alternative), and many of the other features of that route discussed in the 2025 correspondence, such as its "topography," Dkt. 24-1 at 11, cannot have been a surprise to the Bureau.  The 2026 ROD, however, says nothing about which factual conclusions, as opposed to general concerns and calls for further investigation, prompted the Bureau's reevaluation.  *See Children's Hosp. Ass'n of Texas v. Azar*, 933 F.3d 764, 773 (D.C. Cir. 2019) ("An 'unexplained inconsistency' with an earlier position renders a changed policy arbitrary and capricious." (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016))).

Indeed, the entirety of the Bureau's analysis of this dispositive question is limited to two sentences.  *See* Dkt. 14-2 at 10.  In the first of these sentences, the Bureau merely asserts that the

2024 ROD's endorsement of the Red Hills Expressway Highway alternative "was based on a faulty factual premise; namely, that 'more than one viable route alternative' existed." *Id.* And the second sentence merely asserts: "As explained in Section I of this Decision, and further detailed in the EA, additional information provided by UDOT after finalization of the 2024 ROD demonstrates that the Red Hills Parkway Expressway alternative is not technically or economically feasible." *Id.* One can search Section I of the Decision in vain, however, without finding the promised explanation. And as discussed above, the 2026 EA merely highlights the uncertainty regarding various regulatory and design issues that were not yet fully explored, the need to acquire or relocate various properties and the loss of direct access to the parkway that other properties would confront, and the "substantial cost of this alternative in comparison with other reasonable alternatives." Dkt. 14-15 at 10–12. But the EA offers no analysis of what *new* information supported the agency's finding that a project that it concluded was "viable" in 2024 was no longer "viable" in 2026. Nor have the Federal Defendants convinced the Court that the agency could make that determination without exploring all of the unsettled questions posed by the EA.

Although the 2026 ROD, at least superficially, agrees with the 2024 ROD's conclusion that the OPLMA requires the Secretary to approve the route, if any, that minimizes adverse effects on the NCA and the Mojave desert tortoise, the Bureau seems to have shifted ground (without explanation) by adopting a balancing test whereby an alternative route could be dismissed based solely on grounds of uncertainty, administrative hurdles, and cost, without offering a reasoned explanation for why that test is justified and how the relevant costs and benefits must be weighed. If the Bureau is simply balancing the increased uncertainty and costs against the reduced environmental impact, that is an unexplained change in position, and, more

importantly, it misreads the statute.  And if, instead, the Bureau means that the difficulties are so certain and formidable that the Red Hills Parkway Expressway could never be built, it has failed to explain why that is so.[6]

*   *   *

The Court, accordingly, concludes that Plaintiffs are likely to prevail on their statutory claim under the OPLMA and their APA claim based on the Bureau's failure adequately to explain the agency's change in position.

2.    *The 2025 BiOp*

Separately, Plaintiffs also argue that the 2025 FWS BiOp's finding that the Northern Corridor Highway would not jeopardize the continued existence of the Mojave desert tortoise or destroy its critical habitat was arbitrary and capricious.  Dkt. 13-1 at 43.  Because the Court has already concluded that Plaintiffs are likely to succeed on their first and second highlighted claims, the Court need not resolve the merits of Plaintiffs' claims under the ESA at this stage and, correspondingly, need not address the Federal Defendants' argument that Plaintiffs' request for a preliminary injunction on the basis of their challenge to the BiOp is procedurally deficient.  *See* Dkt. 24 at 16–19.  The Court merely pauses to note, however, that Plaintiffs appear to raise a substantial question as to the Federal Defendants' compliance with the ESA.

---

[6] The 2026 Decision record also notes another objection to the Red Hills Parkway Expressway— that Washington County and the city of St. George, whose approval would be necessary to construct the project, favor the Northern Corridor Highway.  *See, e.g.*, Dkt. 24-1 at 10.  It is true that the OPLMA requires the Department to consult with Washington County and St. George in identifying the northern transportation route, OPLMA § 1977(b)(2)(A), and that, in a literal sense, it will be impossible to build the Red Hills Parkway Expressway without St. George's cooperation.  But the Court does not understand the OPLMA to give UDOT, Washington County, or St. George a veto over the northern transportation route or to empower the Bureau to choose a route other than that which minimizes harm to the Red Cliffs NCA simply because the Bureau's local partners favor a more damaging alternative.

Under the ESA, federal agencies must "insure that any action . . . is not likely to . . . result in the destruction or adverse modification of [critical] habitat" of a protected species.  16 U.S.C. § 1536(a)(2).  Under the implementing regulations, that requirement is construed as forbidding "a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species."  50 C.F.R. § 402.02.  Here, the 2025 BiOp determined that the Northern Corridor Highway complied with those criteria, emphasizing that fewer than 300 acres of critical habitat would be lost—less than one percent of the critical habitat in the Upper Virgin River Recovery Unit.  Dkt. 14-5 at 77.  The BiOp also acknowledged that a larger area of critical habitat would be "fragmented and degraded" but noted that the Federal Defendants and the state of Utah would work to restore and safeguard other portions of critical habitat in compensation, and that the fragmentation effects would be offset by the planned tortoise passages across the Northern Corridor.  *Id.*  Finally, the BiOp referenced the planned establishment of the new Zone 6 to offset the lost critical habitat.  *Id.* at 77–78.

The Federal Defendants and the Intervenors' defense of the BiOp's reasoning may well carry the day, but Plaintiffs have offered several criticisms that, at least at this preliminary stage, raise substantial concerns.  First, although the directly affected area constitutes a relatively small portion of the entirety of the Mojave desert tortoise's critical habitat, it is also an unusually sensitive location, which is home to a high-density tortoise population in a recovery unit and in which the overall tortoise population has declined significantly.  *See* Dkt. 13-1 at 20–21.  Second, the extent to which the fragmentation of the broader habitat caused by the Northern Corridor Highway will "appreciably diminish" the value of the habitat as a whole appears to turn, in substantial part, on the efficacy of the tortoise crossings envisioned by the Federal

Defendants and the Intervenors, but the BiOp acknowledges that "the effectiveness of [such] structures in aiding long-term population heath and habitat connectivity is unknown." Dkt. 14-5 at 39. Third, the BiOp relies on the establishment of Zone 6 to offset the harm to the critical habitat elsewhere in Red Cliffs NCA. But Zone 6 does not include any designated Mojave desert tortoise critical habitat, *id.* at 33 fig. 4, and it is not clear that the ESA authorizes the Federal Defendants to "trade off" the degradation of critical habitat against the enhancement of non-critical habitat. *See* 16 U.S.C. § 1536(a)(2) (forbidding the "destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical"); *see also Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059, 1076 (9th Cir. 2004) (Allowing "the survival and recovery benefits derived from a parallel habitat conservation project . . . that is not designated critical habitat to stand in for the loss of designated critical habitat in the adverse modification analysis" would "impair Congress' unmistakable aim that critical habitat analysis focus on the actual critical habitat.").

The Court leaves these questions for another day. The questions are important ones, and the Court's deliberations will benefit from further development from the parties at the summary judgment stage of this proceeding. It is enough for present purposes to conclude that Plaintiffs are likely to succeed on their challenge to the 2026 decision under the OPLMA and the APA.

## C.    Irreparable Injury

It is not enough, however, to conclude that Plaintiffs are likely to succeed on the merits. A party seeking a preliminary injunction must also show that, in the absence of preliminary relief, the party is likely to suffer an irreparable injury that is "certain and great . . . and so imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in

original) (citation modified).  Here, Plaintiffs have demonstrated that they "face[] imminent or ongoing irreparable injury stemming from the [D]efendants' hampering of their aesthetic and environmental interests," as is required for preliminary relief.  *Appalachian Voices v. Chu*, 725 F. Supp. 2d 101, 105 (D.D.C. 2010).

It is true that the construction of the actual Northern Corridor Highway is not imminent. *See* Dkt. 13-1 at 53 ("initial construction activities pose the *risk of facilitating* the ultimate construction of the highway" (emphasis added)).  Indeed, the Federal Defendants represent that they have not yet issued a permit allowing UDOT to commence construction, Dkt. 24 at 33, and Plaintiffs agree that there is no current "timeline for design and construction" of the highway, Dkt. 28 at 7 (citation modified).  But Plaintiffs have, nevertheless, established a qualifying irreparable injury resulting from the "[g]round disturbance associated with initial fencing and related activities" that will occur in the absence of an order from this Court.  Dkt. 13-1 at 52.

As an initial matter, the Court notes that the BiOp does not separately address the effect that construction of the fencing will have on the tortoises or other species or plant life; but it is conceded that the entire project will destroy hundreds of acres of critical habitat for the Mojave desert tortoise, Dkt. 14-5 at 77, and result in the "take" of around 100 tortoises, *id.* at 76.  The Court further notes that the Intervenors have committed to taking steps to mitigate the taking of tortoises during the construction of the fencing.  But, importantly, neither the Federal Defendants nor the Intervenors dispute that the construction of the fencing will disturb a two-mile stretch of critical habitat, *see* Dkt. 14-3 at 22, will involve moving tortoises, and will involve the removal of vegetation, digging, and the use of heavy machinery in a protected area.  *See generally* Dkt. 32-1 (3d Thornock Decl.)  As explained in a declaration submitted by Plaintiffs' expert, Judy Hohman, even the initial "mitigation measure[s]" associated with erecting tortoise fencing, *see*

Dkt. 13-1 at 30, "will render high-quality critical habitat 'inaccessible to tortoises,' fragmenting the population, increasing predation, removing part of tortoise home ranges, and increasing stressful behavior and greater energy use in drought conditions," *id.* at 53 (quoting Dkt. 13-3 at 52 (Hohman Decl. ¶ 97)), and the "blading" of the ground required to construct the fencing will destroy vegetation and degrade the soil, Dkt. 13-3 at 52–53 (Hohman Decl. ¶ 98).[7]

In arguing that any harm caused by the initial construction activities for the Northern Corridor Highway is redressable, the Intervenors represent that the installed mesh fencing "can easily be removed in the event that [P]laintiffs prevail" later in this litigation. Dkt. 29-1 at 47–48; *see also* Dkt. 22-2 at 6 (2d Thornock Decl. ¶ 18). Even accepting that assertion, however (and ignoring the fencing's impact on the affected tortoises' ability to access critical habitat in the interim), the process of erecting the fencing in the first place will require clearing that critical habitat of vegetation, using heavy machinery, across a 20-foot-wide area on both sides of the ROW. Dkt. 22 at 47. The Intervenors also represent that, should Plaintiffs prevail, they would endeavor to restore the damaged vegetation. *Id.* The record, however, does not allow the Court to conclude that any such restoration efforts would effectively redress the harm done. As Plaintiffs note, for example, the 2025 FWS BiOp acknowledges that previous efforts at restoring native plants in the area had only limited success. Dkt. 14-5 at 42. Plaintiffs' expert attests that vegetation and soil damaged by blading and other construction activities "will not return to pre-surface[-]disturbance conditions in our lifetime," Dkt. 13-3 at 52 (Hohman Decl. ¶ 98), and that

---

[7] The Federal Defendants argue that the Hohman Declaration ought not be considered by the Court because it is outside of the administrative record of the agency actions challenged in this case. Dkt. 24 at 20 n.5. The D.C. Circuit has, however, endorsed review of extra-record materials "in cases where relief is at issue, especially at the preliminary injunction stage." *Esch v. Yeutter*, 876 F.2d 976, 991 (D.C. Cir. 1989) (citation modified). The Court sees no issue, in particular, with considering Plaintiffs' extra-record declarations to assess whether Plaintiffs have established a sufficient likelihood of irreparable injury.

full recovery "may never occur," *id.* at 58 (Hohman Decl. ¶ 108).  Moreover, the construction of

the exclusion fencing will, by fragmenting the critical habitat around the ROW, "confine about

two thirds of this high-density cluster [of Mojave desert tortoises] south of the [Northern

Corridor] and prevent these tortoises from accessing other tortoises and other areas . . . [that]

they may require for feeding, breeding, or shelter" until tortoise-crossing mechanisms are

complete.  *Id.* at 53 (Hohman Decl. ¶ 101).

    At the hearing on Plaintiffs' motion, the Federal Defendants also argued that the scope of

the take of Mojave desert tortoises associated with initial construction activities was insufficient

to merit a preliminary injunction.  Feb. 20, 2026 Hrg. Tr. (Rough at 101).  The authorities that

they cite, however, are inapposite.  First, in *W. Watersheds Project v. Bernhardt*, 468 F. Supp.

3d. 29 (D.D.C. 2020), which dealt with grizzly bears, the Court did acknowledge that it was not

"convinced that the killing of a single member of a threatened species constitutes irreparable

harm," *id.* at 48, but it went on to emphasize that a preliminary injunction was not warranted in

that case because "the grizzly bear population ha[d] been growing for years," and, more

importantly, Plaintiffs had not shown that the challenged agency action would cause the number

of takings to "deviate from past data during the lifecycle of this case," *id.* at 48–49.  But that is

not the case here.  To the contrary, the record demonstrates that the tortoise population is

declining, Dkt. 14-5 at 38, and the FWS has designated the area that construction of the fencing

will inevitably disturb as "critical habitat" for that threatened species, *id.* at 55.  Similarly, the

Federal Defendants' reliance on *Fund for Animals v. Frizzell*, 530 F.2d 982 (D.C. Cir. 1975), is

equally misplaced.  In that case, the D.C. Circuit found no irreparable injury supporting an

injunction when only "the death of a small percentage of a reasonably abundant game species"

was at stake.  *Id.* at 987.  That analysis has little relevance to the current case, involving a

threatened species and the risk of irreparable injury to its critical habitat in a federally protected conservation area. *See Am. Rivers v. U.S. Army Corps of Engineers*, 271 F. Supp. 2d 230, 258–59 (D.D.C. 2003) (finding irreparable injury supporting a preliminary injunction where the challenged action would cause "direct take" and "harm to the habitats" of federally protected species).

The Intervenors also maintain that Plaintiffs cannot show the requisite irreparable injury because the ground-disturbing activities immediately at issue are primarily intended to *mitigate* potential harm to the tortoises and will be accompanied by trained biologists taking every precaution to minimize harm. Dkt. 29-1 at 47. But, as Plaintiffs point out, framing these activities as "mitigating" harm to the tortoises only makes sense if the broader Northern Corridor Highway proceeds. Dkt. 28 at 28. If the construction of the highway were an inevitability, the Court would likely agree with the Intervenors that the tortoise fencing would not, in the aggregate, cause "irreparable injury" meriting an injunction, even if construction of the fencing would, standing alone, cause harm to the tortoise habitat. But because the Northern Corridor Highway project is neither ongoing nor inevitable, the Court cannot offset any harm that the fencing will cause to the tortoises and their critical habitat against some greater harm that the fencing might mitigate if the broader project is allowed to proceed. The Court, accordingly, is persuaded that the tortoise fencing and other ground-disturbing activities will "*worsen* the status quo during the pendency of this litigation." *Id.* (emphasis in original).

The Court recognizes that UDOT is acting in good faith and is making its best efforts to minimize any damage to the tortoises or to their habitat. But it is nonetheless inevitable that, given the nature of the work to be done, some irreparable injury will ensue in the absence of the Court's intervention.

**D.      Balance of Equities and Public Interest**

To prevail on their motion for preliminary injunction, Plaintiffs must also establish that the balance of equities favor preliminary relief and that "an injunction is in the public interest." *Winter*, 555 U.S. at 20.  Those two factors, sometimes analyzed separately, merge when, as here, the defendant is the government.  *Karem v. Trump*, 960 F.3d 656, 668 (D.C. Cir. 2020) (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The Court concludes that Plaintiffs have carried their burden.  Even without embracing the most expansive version of Plaintiffs' theory that equity *always* favors protecting protected species over other considerations, *see* Dkt. 13-1 at 56 (citing *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 817 (9th Cir. 2018)), courts generally recognize that, in "weigh[ing] the competing interests," the law "afford[s] protection of endangered species the highest of priorities in th[at] balancing," *Ctr. for Biological Diversity v. Ross*, 480 F. Supp. 3d 236, 256 (D.D.C 2020).  Similarly, preventing "irreparable harm to public land" typically merits injunctive relief.  *S. Utah Wilderness All. v. Allred*, No. 08-2187, 2009 WL 765882, at *2 (D.D.C. 2009).

On the other side of the ledger, the Intervenors report that further delaying the Northern Corridor will cause millions of dollars in added costs, Dkt. 29-1 at 50–51, which, at the motion hearing, they clarified would primarily result from inflation in the overall construction sector, Feb. 20, 2026 Hrg. Tr. (Rough at 87).  The Court does not wish to minimize the inconvenience of additional delays to this long-envisioned project but, nonetheless, concludes that these financial harms are outweighed by the threatened environmental harm.  That is particularly so given that the Court intends to proceed expeditiously to summary judgment briefing in this case, which should minimize any costs associated with further delay.  For similar reasons, the Court finds that the public interest in Utah's improved transportation infrastructure does not outweigh

the public interest in protecting the Red Cliffs NCA and the tortoise habitat.  *Cf.* Dkt. 29-1 at 52.

Not only does the Court intend to move expeditiously, but, in addition, it is far from clear that

postponing the construction of the tortoise fencing will substantially delay a highway project that

has not yet received regulatory approval.  In this context, and given the substantial time required

to complete a project of this nature, any harm to those transportation interests resulting from this

decision will be, at most, marginal.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction, Dkt. 13, is

hereby **GRANTED**.  As outlined in the separate order, Defendants and their agents, servants,

and employees are enjoined from further activity associated with the Northern Corridor ROW,

and Intervenors are ordered to suspend all activities pursuant to any issued Notice(s) to proceed).

The Court, finally, acknowledges that the Intervenors have requested that, if the Court

does issue an injunction covering the erection of the tortoise fencing and other ground-disturbing

activities, they nonetheless be permitted to engage in "geotechnical work" required for future

stages of the Northern Corridor project.  Dkt. 32 at 2.  The Court, however, currently lacks

sufficient information to determine whether the geotechnical work and the associated drilling,

which involves the use of heavy equipment, would also cause irreparable injury to Plaintiffs.  *See*

*generally* Dkt. 32-1 (3d Thornock Decl.).  The Court, accordingly, will direct the parties to meet

and confer as to whether the preliminary injunction can be modified to permit the Intervenors'

requested activities.  If the parties cannot reach an agreement, the Intervenors should file their

proposed modification of the injunction with the Court, and Plaintiffs may file an opposition

including, if necessary, a declaration explaining the harm that even that limited activity would

cause to the Mojave desert tortoises and their critical habitat.  The Court will then promptly

decide whether the proposed modification is appropriate.

        **SO ORDERED**.

                              /s/ Randolph D. Moss
                              RANDOLPH D. MOSS
                              United States District Judge

Date:  March 1, 2026